# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| **THE HOUSTON MUNICIPAL EMPLOYEES PENSION SYSTEM and SHELL PENSION TRUST,** | |
| **Plaintiffs,** | |
| **v.** | |
| **BP, PLC; BP AMERICA, INC.; BP EXPLORATION & PRODUCTION, INC.; ANTHONY B. HAYWARD; DOUGLAS SUTTLES; H. LAMAR MCKAY; BYRON E. GROTE; DAVID RAINEY; ROBERT DUDLEY; ROBERT MALONE; JOHN BROWNE; ANDREW G. INGLIS; and PETER SUTHERLAND,** | **CIVIL ACTION NO. 4:12-CV-3714** |
| | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## COMPLAINT FOR THE VIOLATION OF
## <u>TEXAS STATUTORY AND COMMON LAW</u>

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................. 2

II.   JURISDICTION AND VENUE .................................................................... 9

III. THE PARTIES ............................................................................................... 10

    A.  Plaintiffs ................................................................................................. 10

    B.  Defendants ............................................................................................. 10

IV.   BACKGROUND ............................................................................................ 15

    A.  BP's Prior Safety Debacles Demonstrate That Process Safety Was
    Flawed, Leading To The Creation Of The Baker Panel And A Renewed
    Commitment for Process Safety ........................................................... 15

    B.  The Texas City Refinery Explosion and The Prudhoe ....................... 17

    C.  The Findings of the Baker Report are Made Publicly Available ....... 19

    D.  BP Retaliates Against Safety Whistleblowers in the Gulf of Mexico ... 23

V.   THE *DEEPWATER HORIZON* EXPLOSION AND ITS AFTERMATH
REVEALS THAT BP CONTINUED TO FLOUT PROCESS SAFETY ....... 25

    A.  BP's Systemic Failures were the Catalyst for the *Deepwater Horizon* Tragedy . 25

    B.    BP Was Completely Unprepared to Control the Oil Spill ................... 33

VI.   DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS ......... 44

VII.  ADDITIONAL SCIENTER ALLEGATIONS ............................................. 77

    A.  Defendants Knew, or Recklessly Disregarded, That BP's Process Safety
Procedures Did Not Adequately Address the Known Risks in Deepwater Drilling,
Risks that Materialized at the Macondo Well ...................................... 77

    B.  BP Cuts Corners and Ignores Safety Risks on the *Deepwater* ............... 79

    C.  BP's Conduct Did Not Conform to Industry Standard ....................... 83

    D.  BP Knowingly or Recklessly Disregarded That its 2007-2009 ........... 85

i

**E.    Defendants' Estimates of the Gulf Oil Spill are Flatly Contradicted** ........................ 87

**VIII.   RELIANCE** ............................................................................................... 93

**IX.   THE CLAIMS ARE TIMELY FILED** ........................................................ 93

**X.    COUNTS** .................................................................................................... 94

**PRAYER FOR RELIEF** .......................................................................................... 103

**JURY TRIAL DEMANDED** .................................................................................... 104

Plaintiffs, The Houston Municipal Employees Pension System and Shell Pension Trust, by and through undersigned counsel, hereby allege as follows:

1. Plaintiffs' allegations are based upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based upon the investigation of their counsel including, without limitation:

(a) a review and analysis of public filings, reports, and other documents and information pertaining to or disseminated by BP including, but not limited to, filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, news articles, and reports by securities analysts;

(b) review and analysis of other publicly available information concerning BP, including governmental records, documents obtained through other civil actions against BP, independent reports, and other testimony, documents, and reports obtained in connection with hearings held by the U.S. House of Representatives, the U.S. Senate, and the Joint Investigation of the U.S. Coast Guard and Bureau of Ocean Energy Management, Regulation and Enforcement ("Joint Investigation");

(c) the Report of the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling ("Presidential Commission Report");

(d) the Consolidated Amended Class Action Complaint (the "Class Action Complaint") and other filings, pleadings, and orders filed in the United States District Court for the Southern District of Texas in the action styled as *In re BP p.l.c. Securities Litigation*, Docket No. 10-md-02185 (the "Securities Class Action");

(e) the Complaint and other filings, pleadings, and orders filed in the United States District Court for the Eastern District of Louisiana in the action styled *SEC. v. BP p.l.c.*, Docket No. 2:12-cv-02774-CJB-SS; and

(f) the Criminal Information and other documents filed in the United States District Court for the Eastern District of Louisiana in the action styled *United States v. BP Exploration & Production, Inc.*, Docket No. 2:12-cr-00292-SSV-DEK.

## I.   <u>INTRODUCTION</u>

2.      Plaintiffs bring this action in connection with their transactions in BP, plc ("BP") ordinary shares between June 30, 2005, and June 1, 2010, inclusive (the "Relevant Period"). This action alleges that BP, some of its subsidiaries, and certain executive officers and directors concealed material information and made false and misleading statements concerning BP's implementation of process safety measures and its ability to respond to a "worst case" oil spill in the Gulf of Mexico region.

3.      On April 20, 2010, a massive explosion rocked the *Deepwater Horizon*, a deep sea oil rig owned by Transocean Ltd. ("Transocean"), but leased, operated, and controlled by BP in the Gulf of Mexico, killing eleven crew members and injuring several others.  When the explosion occurred, the crew was preparing to place the Macondo oil well into "temporary abandonment" – a process that was already 45 days behind schedule and $58 million over budget – until another production rig could get there and begin pumping oil or gas for production.

4.      The *Deepwater Horizon* burned for almost two days before finally sinking on the morning of April 22, 2010.  As the oil rig went under, it further damaged the pipe that had connected the rig to the wellbore (the "riser").  The crew tried to activate the *Deepwater Horizon*'s blowout preventer ("BOP"), a device used to seal a well in an emergency situation such as this, which failed.  The disaster was exacerbated by the lack of a back-up BOP, which a 2004 study by federal regulators identified as an important safety feature that should be present for the type of deepwater drilling BP conducted in the Gulf of Mexico.  As a result, millions of barrels of oil began spewing into the water, creating an environmental hazard of unprecedented proportions.  BP, for its part, tried to obscure the severity of the oil spill, initially claiming a release of only 1,000 barrels per day.  However, BP's estimate was found by federal

2

investigators to be a fraction of the actual amount leaking into the Gulf every day.

5.      Despite public representations that BP already had a plan in place to contain a "worst case" oil spill, Defendants adopted a hit-or-miss approach – applying various tactics that were being haphazardly developed – as the spill continued practically unabated.  This scattershot approach and BP's failure to control the spill within a reasonable period of time was made worse by the misleading statements of BP's senior officers, including defendants Anthony B. Hayward, BP's Chief Executive Officer at the time, and Douglas Suttles, who was in charge of BP's spill response team.  These senior officers obfuscated the impact of the disaster by providing the market with materially false and misleading oil spill figures that were belied by contemporaneous internal BP reports that revealed substantially larger amounts of oil were rushing into the Gulf of Mexico than BP's senior officers had claimed.

6.      In fact, more than two months after the *Deepwater Horizon* explosion, BP remained evasive.  For example, on June 17, 2010, defendant Hayward testified before Congress' Subcommittee on Oversight and Investigations concerning BP's responsibility with respect to the *Deepwater Horizon* disaster and the resulting oil spill.  During his testimony to Congress, Hayward dodged giving substantive answers to direct questions, leading Congressman Henry Waxman to proclaim that "BP's corporate complacency is astonishing … BP cut corner after corner to save a million dollars here and a few hours or days there.  And now the whole Gulf Coast is paying the price."

7.      Finally, on July 16, 2010, after some 87 days had passed since the *Deepwater Horizon* explosion, BP finally stemmed the flow of oil from the Macondo well, but only after exacting a heavy environmental toll with an estimated 5 million barrels of oil discharged into the Gulf of Mexico – surpassing the Exxon Valdez disaster on its way to becoming the worst

3

environmental disaster in U.S. history.

8.      At least nine governmental investigations were commenced to investigate the disaster, including the Presidential Commission appointed by President Barack Obama.  The Presidential Commission, after interviewing hundreds of witnesses, reviewing hundreds of thousands of pages of documents and consulting with industry experts, issued the "Presidential Commission Report" in January 2011. The first conclusion of the Presidential Commission Report was sobering: "[t]he explosive loss of the Macondo well could have been prevented." Indeed, the Presidential Commission specifically found that: "the blowout was not the product of a series of aberrational decisions made by rogue industry or government officials that could not have been anticipated or expected to occur again.  Rather, the root causes are systemic" to BP.

9.      Indeed, the Presidential Commission detailed numerous safety tests and procedures that the *Deepwater Horizon* crew failed to perform or just simply ignored.  The Presidential Commission Report concluded that "[t]he immediate causes of the Macondo well blowout can be traced to a series of identifiable mistakes made by BP, Halliburton, and Transocean that reveal such systematic failures in risk management that place in doubt the safety culture of the entire industry."

10.     With the biting words of the Presidential Commission in mind, it should come as no surprise that BP suffered from a string of catastrophic industrial incidents leading into and during the Relevant Period, including incidents related to its off-shore drilling operations. Notorious among them were an explosion at BP's Texas City, Texas, refinery in 2005 that killed 15 workers and injured more than 170, and the discovery of a 212,000 gallon oil leak in a section of poorly maintained corroded pipe in its Prudhoe Bay, Alaska, transit pipelines in March 2006.

11.     On the heels of the Texas City Refinery disaster, on June 30, 2005, the Company

4

filed its Annual Report with the SEC on Form 20-F, which contained, among other things, a pledge that BP had implemented protocols to ensure regulatory and safety compliance by all employees.  In fact, to confirm its newfound commitment to process safety, on August 17, 2005, BP issued a press release announcing that it was "appoint[ing] an independent panel to review the safety management systems and corporate safety culture" of BP's subsidiary responsible for its U.S. refining operations.  Then-CEO Lord Browne was quoted as saying "the Texas City explosion was the worst tragedy in the recent history of BP, and we will do everything possible to ensure nothing like it happens again.  Today's recommendation from the [Chemical Safety Board ("CSB")] is a welcome development and we take it seriously."

12.     At the time, the Texas City refinery disaster seemed to mark a turning point in the Company's view on process safety.  Indeed, on October 24, 2005, BP issued a press release announcing that its own independent panel would be led by former U.S. Secretary of State James Baker, III (the "Baker Panel").  The Baker Panel's investigation culminated in a report spanning more than 350 pages (the "Baker Report") and finding, in the words of the Presidential Commission, that "BP management had not distinguished between occupational safety – concern over slips, sprains, and other workplace accidents – and process safety: hazard analysis, design for safety, material verification, equipment maintenance, and process-changing reporting.  And the [Baker P]anel further concluded that BP was not investing leadership and other resources in managing the highest risks."  More specifically, the Baker Panel asserted that: "from the top of the company, starting with the Board and going down … BP has not provided effective process safety leadership and has not adequately established process safety as a core value."

5

13.     The Baker Panel singled out organizational problems as the root cause of BP's continued failure to learn from, and respond to, major incidents, finding "a lack of operating discipline, toleration of serious deviations from safe operating practices, and apparent complacency toward serious process-safety risks."

14.     On January 16, 2007, Defendants publicly released the Baker Report, which contained 10 recommendations "to help bring about sustainable improvements in process safety performance."

15.     Then-BP Chief Executive Officer John Browne embraced the Baker Report recommendations, acknowledging that "BP gets it.  And I get it too."  Indeed, former CEO Browne emphasized that "BP's workforce is ready, willing and able to participate in a sustained Group-wide effort to move BP towards excellence in process safety.  BP's safety lapses have been chronic."

16.     Throughout the Relevant Period, Defendants would again and again return to this pledge and the recommendations advanced in the Baker Report to assure investors that BP had learned its lesson and that its operations were now safe and reliable.  BP went so far as to say that it strived to be an industry leader in process safety and managing risk.  For instance, on a conference call with stock market analysts in February 2007, former-CEO Browne reaffirmed his and BP's commitment to implementing the Baker Report recommendations: "above all else we need to concentrate on two things – safety and performance.  Safety is fundamental to everything that we will do.  We will embrace with equal commitment each of the three dimensions of safety – personal safety, process safety and the environment.  Our aspiration is to be an industry leader in each."

17.     When Defendant Hayward succeeded Browne as CEO in May 2007, one of his

first commitments was to "focus on safety like a laser."  Defendant Hayward, the other Individual Defendants, and BP itself repeatedly reaffirmed in public filings with the SEC and press releases the Company's commitment to process safety and, in particular, the virtues of such efforts in one of its greatest profit centers – the Gulf of Mexico.

18.     As has since been revealed, the truth greatly diverged from Browne's and defendant Hayward's affirmations.  For example, a January 24, 2011 *Fortune* magazine article entitled "BP: An Accident Waiting to Happen," revealed a previously unreleased internal BP strategy document dated December 2008 that specifically warned BP executives of serious process safety "gaps" in the Gulf of Mexico:

> It's become apparent that process-safety major hazards and risks are not fully understood by engineering or line operating personnel.  Insufficient awareness is leading to missed signals that precede incidents and response after incidents, both of which increases the potential for and severity of process-safety related incidents.

The document concluded that BP's employees needed "major hazard awareness" training.

19.     The *Fortune* article featured Nancy Leveson ("Leveson"), an industrial safety expert at the Massachusetts Institute of Technology, who served on a panel that investigated BP's safety practices after its Texas City refinery explosion and subsequently taught safety classes to BP executives in a course entitled BP "Operations Academy."  More recently, Leveson served as an advisor to the Presidential Commission.  In the article, Leveson was quoted as criticizing BP's approach to safety, explaining that BP "just did safety wrong."  She determined that BP was "producing a lot of standards but many were not very good and many were irrelevant."  She was so troubled by BP's approach to safety that, in January 2010 – just months before the *Deepwater Horizon* tragedy – she prophetically warned colleagues that BP was "an accident waiting to happen."

20.     Not surprisingly, the string of safety deficiencies above existed not only with refineries and pipelines, but also with offshore drilling operations, which would prove catastrophic on April 20, 2010.  The Presidential Commission Report concluded that, despite receiving warnings from the prior disasters about the need for clear operational protocols and safety measures, BP had no adequate process safety procedures in place with regard to well testing in deep sea drilling.  Similarly, it lacked established protocols for securing a well before placing it into temporary abandonment.  To compound the deficient safety procedures and protocols, BP also failed to suitably outfit rigs with properly designed and tested equipment to meet the extreme risks posed by deepwater drilling operations.

21.     BP's regulatory filings throughout the Relevant Period, however, assured investors that the Company was fully prepared to address the risks associated with its Gulf Operations.  For example, BP's Oil Spill Response Plan ("OSRP") for the Gulf, publicly filed with the U.S. Department of Interior's Minerals Management Service ("MMS") on December 1, 2000, and subsequently revised on June 30, 2009, stated that the "worst case discharge" from an exploratory well from offshore drilling is expected to be 250,000 barrels of crude oil per day. The Company's Initial Exploration Plan for Mississippi Canyon Block 252 ("Macondo IEP"), and made available to the public no later than March 10, 2009, also assured investors that "worst case" scenarios were contemplated by BP and that the Company was capable of responding to a worst case event.

22.     After the *Deepwater Horizon* explosion, the truth about BP and its lack of commitment to and implementation of safety processes to avoid preventable incidents began to emerge.  Investors learned that: BP was not the safe and secure company it portrayed itself to be after the Texas City refinery and Prudhoe Bay, Alaska disasters; BP had not implemented the

process safety overhaul it represented it would in response to the Baker Report; BP knew or recklessly disregarded that the amount of the spill was vastly greater than it had publicly admitted; BP knew or recklessly disregarded that its statements regarding the size of the oil spill were false and materially misleading when made; BP could not contain the oil spill; and BP could not expeditiously stop the flow of oil from the well (which did not stop for 87 days after the explosion).  As a result, when the truth was revealed, BP's stock price plunged in value, causing Plaintiffs to suffer substantial damages.

## II.   <u>JURISDICTION AND VENUE</u>

23.     The claims herein arise under the common and statutory law of the State of Texas.

24.     This Court has jurisdiction pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b)(1).  Plaintiffs allege that Defendants made false and misleading statements "in connection" with BP's "operation" conducted on the Outer Continental Shelf related to "exploration of subsurface minerals."

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  Many of the acts and transactions that give rise to the violations of law alleged herein, including the dissemination to the public of materially untrue and misleading press releases and filings with the SEC, occurred in substantial part in this District.  Furthermore, BP's U.S. operations are headquartered in this District and two Defendants maintain their principal places of business in Houston. Moreover, by Order dated August 10, 2010, the Judicial Panel on Multidistrict Litigation transferred several related actions to this jurisdiction for coordination and pretrial proceedings.

26.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of a

national securities exchange and market.

### III.    THE PARTIES

#### A.    Plaintiffs

27.    Plaintiff The Houston Municipal Employees Pension System ("HMEPS") purchased BP ordinary shares outside the United States at artificially inflated prices during the Relevant Period in reliance on Defendants' false and misleading statements and was damaged by Defendants' misconduct.

28.    Plaintiff Shell Pension Trust ("Shell") purchased BP ordinary shares outside the United States at artificially inflated prices during the Relevant Period in reliance on Defendants' false and misleading statements and was damaged by Defendants' misconduct.

#### B.    Defendants

29.    Defendant BP is a United Kingdom corporation with its principal executive offices located at 1 St James' Square, London SW1Y 4PD, United Kingdom.  BP has substantial contacts with the United States, including that: (a) BP is the largest oil and gas producer in the U.S.; (b) BP has 40% of its assets and workers in North America; (c) BP's ordinary shares are listed on the NYSE in connection with its ADS program; (d) roughly 40% of BP's ordinary shares are owned by individuals and institutions within the U.S.; and (e) BP files annual reports and other documents with the SEC.

30.    Defendant BP America, Inc. ("BP America"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas.  BP America produces oil and natural gas products in the United States.  Throughout the Relevant Period, Defendants touted BP America's commitment to process safety and risk management and its ability to monitor the *Deepwater Horizon*'s operations, yet BP America failed to aptly respond to

10

emergency warnings from the *Deepwater Horizon*.

31.     Defendant BP Exploration & Production, Inc. ("BP Exploration"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas.  BP Exploration provided materially false and misleading filings to the MMS during the Relevant Period.  Among other things, the Macondo IEP states that "BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst case discharge, or a substantial threat of such a discharge, resulting from the activities proposed in our Exploration Plan."

32.     Defendant Hayward served as the Company's CEO from May 2007 until October 2010 and served as an executive director of the Company from 2003 to November 2010. Hayward joined BP in 1982 as a rig geologist offshore of Aberdeen, Scotland, and later as a field geologist in various locations throughout the world.  In 1992, he moved to Colombia as exploration manager, and he became president of the BP group in Venezuela in 1995.  Hayward served in various other executive positions beginning in 1997, and from 2002 to 2007, he served as the CEO of BP's exploration and production division, which oversees exploration and drilling in the Gulf of Mexico, among other places.  Hayward was a member of BP's executive management, which is responsible for the day-to-day running of BP.  During the Relevant Period, Hayward signed BP Annual Reports that are alleged herein to have been knowingly or recklessly false and misleading when made.  Hayward also made several false and misleading statements from Houston and operated from Houston following the *Deepwater Horizon* disaster. On July 27, 2010, BP announced that Hayward would step down as the Company's CEO effective October 1, 2010, but he remained on the BP board until November 20, 2010.

33.     Defendant Suttles served as BP's Chief Operating Officer for Exploration and

Production from January 2009 until at least January 2011.  Suttles has more than 25 years' experience in the oil industry, and he spent at least 22 years in various engineering and leadership positions with BP, including roles as Vice President for Northern North Sea Operations and President of BP's Trinidadian oil business.  In January 2007, he was named President of BP Exploration (Alaska) Inc.  As noted in the *Telegraph*, "Suttles was the face of operational briefings during the [Gulf] spill and led the technical response to stopping the oil leak."  During the Relevant Period, Suttles made knowingly or recklessly false and misleading statements as alleged herein.  On January 12, 2011, Suttles abruptly announced that he would be retiring from BP at the age of 50.

34.     Defendant H. Lamar McKay has served as Chairman and President of BP America since January 2009.  He has more than 30 years' experience in the oil industry, and has worked with BP in various roles since 1998, including the Head of Strategy and Planning for Worldwide Exploration and Production, the Business Unit Leader for the Central North Sea in Aberdeen, Scotland, and the Chief of Staff for Worldwide Exploration and Production.  In May 2007, McKay assumed the role of Senior Group Vice President of BP and Executive Vice President of BP America, and in 2008, he became Executive Vice President of BP plc Special Projects, focusing on Russia.  McKay is a member of BP's executive management, which is responsible for the day-to-day running of BP.  During the Relevant Period, McKay knowingly or recklessly made false and misleading statements as alleged herein.

35.     Defendant Byron E. Grote joined BP in 1988 and has served in various positions with the Company, including Chief Financial Officer ("CFO") from 2002 through 2011 and as a director of the Company since 2000.  He previously worked as an Executive Vice President of BP Exploration and Production.  Grote is a member of BP's executive management, which is

12

responsible for the day-to-day running of BP.  During the Relevant Period, Grote signed BP's Annual Reports that are alleged herein to have been knowingly or recklessly false and misleading when made and made other knowingly or recklessly false and misleading statements as well.

36.     Defendant David Rainey served as BP America's Vice President of Gulf of Mexico Exploration from April 2005 through June 2010.  Rainey was a member of BP's executive management, which is responsible for the day-to-day running of BP.  During the Relevant Period, Rainey knowingly or recklessly made false and misleading statements as alleged herein.

37.     Defendant Robert Dudley has served as BP's Group Chief Executive since October 2010, succeeding defendant Hayward, and as an executive director since April 2009. Dudley has worked in the oil industry since 1979 and for BP since 1999, where he has served in numerous roles.  He is a member of BP's executive management, which is responsible for the day-to-day running of BP.  During the Relevant Period, Dudley knowingly or recklessly made false and misleading statements as alleged herein.

38.     Defendant Robert Malone served as Chairman and President of BP America and as an Executive Vice President of BP from July 2006 until February 2009, when he retired. Malone served on BP's executive management team, which is responsible for the day-to-day running of BP.  During the Relevant Period, Malone knowingly or recklessly made false and misleading statements as alleged herein.

39.     Defendant Lord John Browne served as BP's CEO from 1998 until his resignation in May 2007.  Browne, who holds a degree in physics, began working at BP as a university apprentice in 1966.  Browne spent nearly his entire career with BP, holding a variety of

13

production and exploration positions, and serving in executive roles with BP Finance International, BP America, Standard Oil Production Company (which had merged with BP), and The British Petroleum Company PLC.  Browne was a member of BP's executive management, which is responsible for the day-to-day running of BP.  During the Relevant Period, Browne made numerous public statements attesting to BP's commitment to improving personal and process safety practices.  Browne made these false and misleading statements knowingly or recklessly, as alleged herein.

40.     Defendant Andrew Inglis served as the CEO of BP Exploration and Production and as an executive director of BP from February 2007 until October 2010.  During the Relevant Period, Inglis made several public statements attesting to BP's commitment to improving personal and process safety practices in all of its operations.  Inglis made these false and misleading statements knowingly or recklessly, as alleged herein.

41.     Defendant Peter Sutherland served as BP's Chairman from 1997 until 2009. During the Relevant Period, Sutherland made public statements in his capacity as Chairman attesting to the strength of BP's personal and process safety practices. Sutherland made these false and misleading statements knowingly or recklessly, as alleged herein.

42.     Defendants Hayward, Suttles, McKay, Grote, Rainey, Dudley, Malone, Browne, Inglis, and Sutherland are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of BP's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein

14

to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, each of the Individual Defendants knew, were reckless in not knowing, or were negligent in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made regarding BP's operations and safety practices and procedures were then materially false and misleading when made.

43.    BP, BP America, BP Exploration, and the Individual Defendants are collectively referred to herein as the "Defendants."

## IV.    BACKGROUND

### A.    BP's Prior Safety Debacles Demonstrate That Process Safety Was Flawed, Leading To The Creation Of The Baker Panel And A Renewed Commitment for Process Safety

44.    The *Deepwater Horizon* disaster is just the latest example in a string of tragic events resulting from BP's continued failure to operate its facilities in line with industry standards and its own internal safety protocols.  In fact, well before the beginning of the Relevant Period, BP was intimately familiar with the risks associated with the petroleum industry, and deepwater drilling in particular, and had the dubious distinction of being at ground zero for several other catastrophic events.

45.    In 2002, the *Ocean King*, a drill rig that BP was operating in the Gulf of Mexico, suffered two separate drilling blowouts within a three-month span.  In response to these incidents, MMS issued a special Safety Alert to all drilling companies operating in the Gulf of Mexico regarding the serious risk of a blowout in the event of a failed cementing job.  The Safety Alert made particular note of MMS' findings concerning BP's role in the *Ocean King*

incidents, warning others about "erroneous chain of decisions, inadequate training of personnel or knowledge of the diverter system, and inadequate planning."

46.     In May 2003, the *Transocean Enterprise*, an offshore oil rig which BP was contractually responsible for its operations, experienced a near blowout under circumstances eerily similar to those surrounding the *Deepwater Horizon* explosion.   The *Transocean Enterprise* drifted off its drill site just as a well was being completed, breaking the riser pipe linking the rig to the ocean floor.   BP was fortunate this time that the backup "deadman" switch on the rig's BOP worked, sealing the BOP's rams and preventing the damaged riser from leaking oil or gas into the Gulf of Mexico.   Later, an inspection revealed that sections of broken riser pipe were leaning up against the BOP, close to its control lines, and that the BOP itself was partially damaged, revealing that the purportedly "fail safe" BOP was easily susceptible to becoming inoperative by the falling riser pipe, as it did on the *Deepwater Horizon*.

47.     Just over a year later, in August 2004, BP suffered a blowout off the coast of Egypt, when the *GSF Adriatic IV*, a gas drilling rig operated by Global Santa Fe, exploded while completing a well for a joint consortium that included BP.   The blowout occurred after a final cementing job failed, reminiscent of the *Deepwater Horizon* incident.

48.     In 2005, the BOP on the *Deepwater Horizon* underwent an independent five-year audit that revealed problems with gauges and leaks.   This was an indication that the device was not being properly maintained.   The audit, however, was incomplete because the *Deepwater Horizon*'s BOP was in use at the time of the audit and many of its components were never properly tested.   For instance, a key test to determine whether the unit's blind shear rams could cut through actual drilling pipe was never performed.

**B.**    **The Texas City Refinery Explosion and The Prudhoe**
**Bay Oil Spill – Different Places, Same Results**

49.    On March 23, 2005, an explosion occurred at BP's Texas City refinery killing 15 workers and injuring approximately 170 people.  The Texas City refinery explosion led to a string of regulatory investigations by, among others, the U.S. Environmental Protection Agency's ("EPA") criminal investigative division, U.S. Occupational Safety and Health Association ("OSHA"), EPA civil inspectors, the CSB, and the Texas Environmental Quality Commission ("TEQC"), that resulted in BP pleading guilty to one felony count and paying $50 million in criminal fees for the unlawful release of air pollutants during the explosion.  Similarly, OSHA levied a record $87.4 million civil penalty against BP for process safety management violations at its Texas City facility.  In its final report, the CSB charged that the "Texas City disaster was caused by organizational and safety deficiencies at all levels of the BP Corporation."

50.    The investigations following the Texas City refinery explosion demonstrated that BP was warned about deteriorating safety conditions at the facility months before the explosion, but completely disregarded them.  In fact, the CSB noted that "[w]arning signs of a possible disaster were present for several years, but company officials did not intervene effectively to prevent it."  Some of the CSB's key organizational findings included, among other things: (1) cost-cutting, failure to invest, and production pressures from executive managers impaired process safety; (2) BP's board of directors failed to provide effective oversight of the Company's safety culture and major accident prevention programs; (3) Texas City lacked a reporting and learning culture where employees were not encouraged to report safety issues and some feared retaliation for doing so; (4) safety campaigns, goals, and rewards focused on improving personal

17

safety metrics and conduct rather than process safety and management safety systems; (5) several studies, reports, and audits revealed deep-rooted safety issues, but BP's response at all levels was "too little, too late"; and (6) Texas City did not effectively assess changes involving people, policies, or the organization that could affect process safety.  Likewise, on October 29, 2006, a report on *60 Minutes* revealed "evidence that Texas City's own plant manager, Don Parus, was dismayed by unsafe conditions at the refinery and even tried to get the attention of his bosses in London.  [Parus] showed them a report revealing that most workers at the refinery felt that the plant was unsafe: one worker wrote 'the equipment is in dangerous condition and this is not taken seriously.'  Another wrote 'this place is set up for a catastrophic failure.'"

51.     As the investigations in Texas City persisted, in early 2006, an oil spill spewing more than 210,000 gallons occurred on BP's Prudhoe Bay pipelines on Alaska's North Slope.  Although the leak was first discovered on March 2, 2006, the pipeline had actually been leaking for weeks.  Within weeks, federal and state authorities began civil and criminal investigations into the Prudhoe Bay spill.  These investigations ultimately addressed not only the initial March 2006 leak, but a subsequent leak in another part of the pipeline that was discovered in August 2006 and other weaknesses in the pipeline.

52.     An EPA criminal investigation at Prudhoe Bay concluded that widespread corrosion in the pipelines had led to the March and August 2006 leaks and that BP could have prevented the leaks by maintaining and inspecting its pipelines.  In 2007, BP pleaded guilty to a criminal charge in connection with the March 2006 spill, admitting that BP's "criminal negligence" caused the corrosion – and thus the spill itself.  BP was sentenced to three years of probation and fined $22 million.

53.     Although the Texas City and Prudhoe Bay disasters were hundreds of miles from each other and approximately a year apart, they are not unrelated to one another.  This was underscored by Carolyn Merritt, Chairman of the CSB, in her May 2007 testimony before Congress, in which she articulated that "[v]irtually all of the seven root causes identified for the Prudhoe Bay incidents have strong echoes in Texas City," and identified "common findings" that included "flawed communication of lessons learned, excessive decentralization of safety functions and high management turnover.  BP focused on personal safety statistics but allowed catastrophic process safety risks to grow."

**C.     The Findings of the Baker Report are Made Publicly Available
        and BP Portrays Itself As a Company that Puts Safety First**

54.     On the heels of the Texas City refinery disaster, in mid-2005, the CSB recommended that BP appoint an independent commission to investigate the Company's internal safety culture and uncover the causes of the incident as well as to investigate other general concerns with BP's safety environment.  As a result, in October 2005, BP announced the formation of the "U.S. Refineries Independent Safety Review Panel," chaired by Baker.  The Baker Panel began conducting investigations in October 2005 and issued its final report on January 16, 2007.  In its report, the Baker Panel strongly suggested that BP immediately implement the following ten recommendations:

**RECOMMENDATION # 1 – PROCESS SAFETY LEADERSHIP**

The Board of Directors of BP p.l.c., BP's executive management (including its Group Chief Executive), and other members of BP's corporate management must provide effective leadership on and establish appropriate goals for process safety. Those individuals must demonstrate their commitment to process safety by articulating a clear message on the importance of process safety and matching that message both with the policies they adopt and the actions they take.

**RECOMMENDATION  #2 –  INTEGRATED  AND  COMPREHENSIVE**

19

**PROCESS SAFETY MANAGEMENT SYSTEM**

BP should establish and implement an integrated and comprehensive process safety management system that systematically and continuously identifies, reduces, and manages process safety risks at its U.S. refineries.

## RECOMMENDATION #3 – PROCESS SAFETY KNOWLEDGE AND EXPERTISE

BP should develop and implement a system to ensure that its executive management, its refining line management above the refinery level, and all U.S. refining personnel, including managers, supervisors, workers, and contractors, possess an appropriate level of process safety knowledge and expertise.

## RECOMMENDATION #4 – PROCESS SAFETY CULTURE

BP should involve the relevant stakeholders to develop a positive, trusting, and open process safety culture within each U.S. refinery.

## RECOMMENDATION #5 – CLEARLY DEFINED EXPECTATIONS AND ACCOUNTABILITY FOR PROCESS SAFETY

BP should clearly define expectations and strengthen accountability for process safety performance at all levels in executive management and in the refining managerial and supervisory reporting line.

## RECOMMENDATION #6 – SUPPORT FOR LINE MANAGEMENT

BP should provide more effective and better coordinated process safety support for the U.S. refining line organization.

## RECOMMENDATION #7 – LEADING AND LAGGING PERFORMANCE INDICATORS FOR PROCESS SAFETY

BP should develop, implement, maintain, and periodically update an integrated set of leading and lagging performance indicators for more effectively monitoring the process safety performance of the U.S. refineries by BP's refining line management, executive management (including the Group Chief Executive), and Board of Directors. In addition, BP should work with the U.S. Chemical Safety and Hazard Investigation Board and with industry, labor organizations, other governmental agencies, and other organizations to develop a consensus set of leading and lagging indicators for process safety performance for use in the refining and chemical processing industries.

**RECOMMENDATION #8 – PROCESS SAFETY AUDITING**

BP should establish and implement an effective system to audit process safety performance at its U.S. refineries.

**RECOMMENDATION #9 – BOARD MONITORING**

BP's Board should monitor the implementation of the recommendations of the Panel ... and the ongoing process safety performance of BP's U.S. refineries. The Board should, for a period of at least five calendar years, engage an independent monitor to report annually to the Board on BP's progress in implementing the Panel's recommendations .... The Board should also report publicly on the progress of such implementation and on BP's ongoing process safety performance.

**RECOMMENDATION #10 – INDUSTRY LEADER**

BP should use the lessons learned from the Texas City tragedy and from the Panel's report to transform the company into a recognized industry leader in process safety management. The Panel believes that these recommendations ... can help bring about sustainable improvements in process safety performance at all BP U.S. refineries.

55.     The Baker Report further noted that "[b]ased on its review, the Panel believes that BP has not provided effective process safety as a core value across all its five U.S. refineries."  In addition, as noted by the Presidential Commission, "[the Baker Panel] found that BP management had not distinguished between occupational safety – concern over slips, sprains, and other workplace accidents – and process safety:hazard analysis, design for safety, material verification, equipment maintenance, and process-change reporting.  And the [P]anel further concluded that BP was not investing leadership and other resources in managing the highest risks."

56.     Upon the release of the Baker Report, BP assured investors that it would implement the mandates across all lines of its business.  For instance, on January 16, 2007, BP issued a press release entitled "BP will Implement Recommendations of Independent

21

Safety Review Panel," which, in relevant part, provided:

> HOUSTON – BP p.l.c. will implement the recommendations made by an independent safety review panel as part of the company's continuing effort to improve its safety culture and to strengthen and standardize process safety management at BP's five U.S. refineries.
>
> BP already has taken a number of actions which align with the recommendations of the BP US Refineries Independent Safety Review Panel and will, after a more thorough review, develop plans for additional action at its U.S. refineries and for applying lessons learned elsewhere.
>
> In a report made public today, the Panel identified material deficiencies in process safety performance at BP's U.S. refineries and called on BP to give process safety the same priority BP has historically given personal safety and environmental performance.  The Panel made recommendations for improving BP's process safety leadership, systems, expertise and oversight of process safety performance.
>
> John Browne said: "I want to thank Secretary Baker and the other Panel members for their effort, their insights and their recommendations," Browne said.  "We asked for a candid assessment from this diverse group of experts and they delivered one.  We will use this report to enhance and continue the substantial effort already underway to improve safety culture and process safety management at our facilities."
>
> *        *        *
>
> "Many of the Panel's recommendations are consistent with the findings of our own internal reviews," said Browne.  "As a result, we have been in action on many of their recommendations for a year or more.  Our progress has been encouraging but there is much more to do.  Members of our refining leadership team will be meeting with the Panel within the week to address how best to implement these recommendations.
>
> "I share the Panel's confidence in BP's refining workforce," Browne added.  "They are, as the Panel stated, ready, willing and able to participate in a sustained effort to move BP towards process safety excellence.  As I told the Panel, I intend to ensure BP becomes an industry leader in process safety management and performance.  We will want to do everything possible to prevent another tragedy like the one that occurred at Texas City."

57.    Likewise, in a January 16, 2007 press conference responding to the findings of the Baker Report, defendant Browne announced:

If I had to say one thing which I hope you will all hear today it is this 'BP gets it.'  And I get it too.  This happened on my watch and, as Chief Executive, I have a responsibility to learn from what has occurred.  I recognise the need for improvement and that my successor, Tony Hayward, and I need to take a lead in putting that right by championing process safety as a foundation of BP's operations.

*    *    *

The list of what we have done since the accident shows how seriously we take process safety.

58.    At that time, former CEO Browne further emphasized that there would be a "Group-wide effort to move BP towards excellence in process safety.  BP's safety lapses have been chronic."

59.    Yet the truth, as described herein, is not only that BP did not "get it," but that Defendants knew of or recklessly disregarded their continued failure to implement the process safety programs and procedures necessary to avoid the recurrence of similarly preventable deep sea drilling incidents. The occurrence of the worst industrial incident in history, along with the Presidential Commission's finding that BP has not met "its professed commitment to safety" belied BP's public representations concerning its professed commitment to ensuring the safety of its deep sea drilling operations.

### D.    BP Retaliates Against Safety Whistleblowers in the Gulf of Mexico

60.    According to the CSB's findings, BP created an environment that discouraged employees from raising concerns about the safety and integrity of BP's operations that continued to run rampant during the Relevant Period.

61.    In August 2008, Kenneth Abbott ("Abbott"), a BP engineer working on design and blueprint management issues relating to the operations of BP's *Atlantis* rig (a major BP rig involved in drilling deepwater exploration and production wells in the Gulf of Mexico), began to

23

raise concerns with BP managers about the Company's practices and policies for managing and updating designs and blueprints for its infrastructure and equipment on the *Atlantis*.  Abbott's concerns were corroborated by a fellow employee, BP manager Barry Duff ("Duff"), who wrote to BP managers stating that a lack of properly-reviewed and approved designs could result in "catastrophic operating errors" and that "currently there are hundreds if not thousands of Subsea documents that have never been finalized," a situation which Duff referred to as "fundamentally wrong."

62.    Abbott continued to raise the above concerns from November 2008 through January 2009, when he was fired in retaliation for his whistle-blowing.  This led Abbott to file a federal lawsuit in which he alleged that his employment was terminated by BP because he alerted senior managers about *Atlantis* operating without proper plans.

63.    According to Abbott's lawsuit, "hundreds if not thousands of documents" relating to *Atlantis'* construction and operation were not approved by regulators, as required. Abbott further alleged that "BP managers recognized the gravity of this problem" because "using the incomplete, unapproved drawings, 'could lead to catastrophic Operator errors due to their assuming that the drawing is correct.  Turning over incomplete drawings to the Operator for their use is a fundamental violation of basic Document Control, the IM Standard[,] and Process Safety Regulations."

64.    In addition, the Presidential Commission Report found that a contributory factor to the *Deepwater Horizon* explosion and the problems in attempting to trigger the BOP related to BP's practice of not updating designs and plans from their original schematics – much like the problems complained about with regard to the *Atlantis*.

65.    On the issue of retaliation, the Presidential Commission Report also noted that a

24

survey conducted in March 2010 indicated that crew members working on the *Deepwater Horizon* feared retaliation.  The survey, which included workers on the *Deepwater Horizon* and three other rigs, was conducted between March 12 and March 16, 2010 – *i.e.*, approximately one month prior to the *Deepwater Horizon* explosion.  According to the Presidential Commission, the survey found that: "Some 46 percent of crew members surveyed felt that some of the workforce feared reprisals for reporting unsafe situations, and 15 percent felt that there were not always enough people available to carry out work safely."

## V.   THE *DEEPWATER HORIZON* EXPLOSION AND ITS AFTERMATH REVEALS THAT BP CONTINUED TO FLOUT PROCESS SAFETY

### A.   BP's Systemic Failures were the Catalyst for the *Deepwater Horizon* Tragedy

66.   The tragedy of the Macondo well explosion was avoidable, and BP's conduct evidenced a systematic departure from recognized industry safety practices.  In fact, the Presidential Commission found that "the cumulative risk that resulted from these decisions and actions was both unreasonably large and avoidable[.]''

67.   On March 29, 2008, BP paid approximately $34 million to acquire the exclusive drilling rights from the MMS for the Mississippi Canyon Block 252, a nine-square-mile plot in the Gulf of Mexico where the Macondo well is situated.  The Macondo well was located approximately 48 miles off Louisiana's shoreline.  It was believed that the well could hold as much as fifty million barrels of producible oil.  According to the President's Commission, "[a]lthough the Mississippi Canyon area has many productive oil fields, BP knew little about the specific geology of Block 252: Macondo would be its first well on the new lease.  BP planned to drill the well to 20,200 feet, both to learn more about the geology of the area and because it thought – based on available geological data – that it might find an oil

and gas reservoir that would warrant installing production equipment at the well."

68.   However, before it could commence drilling operations, BP was required, pursuant to the Oil Pollution Act of 1990, as supplemented by a Presidential Executive Order, to prepare and file oil spill response plans with MMS demonstrating the Company's specific strategy and ability to respond to an oil spill if one occurred while drilling in the Gulf of Mexico. This required, among other things: (1) an emergency response action plan; (2) disclosure of the equipment available to combat an oil spill; (3) any oil spill response contractual agreements with third-parties; (4) calculations of the worst-case discharge scenarios; (5) a plan for dispersant use in case of a spill; (6) an in-situ oil burning plan; and (7) information regarding oil spill response training and drills. *See* 30 C.F.R. § 254.21.

69.   Accordingly, BP filed its "Regional Oil Spill Response Plan – Gulf of Mexico" with the MMS on December 1, 2000 ("BP's Regional OSRP"). BP's Regional OSRP covers a massive area, including all of the United States' interests in the Gulf of Mexico. BP has approximately 600 leases and operates roughly 70 oil wells in the Gulf of Mexico, all of which were covered by BP's Regional OSRP.

70.   The latest version of BP's Regional OSRP, which was filed on June 30, 2009, estimated the "TOTAL WORST CASE DISCHARGE" scenario for the Gulf of Mexico at a range between a release of 28,033 barrels of oil per day ("bopd") to 250,000 bopd.

71.   BP's Regional OSRP explicitly stated that the Company and its subcontractors could recover approximately 491,721 bopd in the event of an oil spill in the Gulf of Mexico:

> Offshore response strategies may include attempting to skim utilizing MSRC & NRC's Oil Spill Response Vessels (OSRVs), Oil Spill Response Barges (OSRBs), ID Boats, and Quick Strike OSRVs, which have a combined derated recovery rate of 491,721 barrels/day. Temporary storage associated with the identified skimming and temporary storage equipment equals 299,066 barrels.

72.     Additionally, BP submitted the Macondo IEP for the Mississippi Canyon Block 252 to the MMS on March 10, 2009.   (BP's Regional OSRP and the Macondo IEP are collectively referred to herein as "BP's Oil Spill Response Plan").

73.     In the Macondo IEP, BP claimed that there would be no issues in responding to a worst case scenario while drilling the Macondo well:

> Since BP Exploration & Production Inc. has the capability to respond to the appropriate worst-case scenario included in its regional OSRP … and since the worst-case scenario determined for our Exploration Plan does not replace the appropriate worst-case scenario in our regional OSRP, I hereby certify that BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such a discharge, resulting from the activities proposed in our Exploration Plan.

*       *       *

> [D]ue to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.

74.     With the filings to the MMS satisfied, the Transocean rig *Marianas* began drilling the Macondo well in October 2009 and drilled for approximately 34 days, but had to stop drilling and move off-site to evade Hurricane Ida.   Despite this, the *Marianas* sustained enough damage that a replacement rig was needed to resume operations.

75.     The *Deepwater Horizon* replaced the *Marianas* and arrived at the Macondo well on January 31, 2010.   After initial preparations were completed on February 10, 2010, the *Deepwater Horizon* continued drilling operations shortly thereafter.   Its first undertaking was to lower its BOP into the wellhead left by the *Marianas*:   once in place, everything needed in the well, such as drilling pipe, bits, casing, and drilling mud, would pass through the BOP.

76.     When drilling a deepwater well like Macondo that extends 13,000 feet below the

ocean floor, controlling the well pressure is undoubtedly a priority.   If the proper safety procedures are not followed, uncontrolled well pressure can cause an explosion.

77.     Once the initial drilling of the well was complete, the *Deepwater Horizon*'s crew was to, according to standard practice, plug the well and "temporarily abandon" it until BP's engineers in Houston could formulate a plan to extract the oil.

78.     The *Deepwater Horizon* was a giant off-shore drilling rig with the capabilities needed to drill a well like Macondo.  However, BP, like most operators, would use a smaller and less costly rig to "complete" the well, *i.e.*, connect to the well to pump oil and gas from the site. To place the well into temporary abandonment and make room for the new rig, the *Deepwater Horizon* had to remove its own BOP and riser from the wellhead.  According to the Presidential Commission Report, there were "[f]our key features of the temporarily abandoned well worth noting":

> First is the single 300-foot-long cement plug inside the wellbore.   MMS regulations required BP install a cement plug as a backup for the cement job at the bottom of the well.  Second is the location of the cement plug: BP planned to put it 3,300 feet below the ocean floor, or "mudline" (which was deeper than MMS regulations allowed without dispensation, and deeper than usual).    Third is the presence of seawater in the well below the sea floor: BP planned to replace 3,000 feet of mud in the wellbore above the cement plug with much lighter seawater (seawater weighs roughly 8.6 ppg, while the mud in the wellbore weighed roughly 14.5 ppg).  Fourth is the lockdown sleeve – a mechanical device that locks the long casing string to the wellhead to prevent it from lifting out of place during subsequent production operations.

Throughout this process, the well is monitored and a series of tests are performed to insure that the well is secure, *i.e.*, that no hydrocarbons are leaking into the well.  According to the Presidential Commission, neither the BP Well Site leaders, nor any of the rig's crew, had seen the temporary abandonment plan for the Macondo well prior to 10:43 a.m. on the day the abandonment procedure began.   Indeed, the temporary abandonment plan had undergone

numerous changes leading up to April 20, 2010, but, according to the Presidential Commission, "[i]t does not appear that the changes to the temporary abandonment procedures went through any sort of formal review at all."

79.     While preventable, the *Deepwater Horizon* disaster resulted from the same cost-saving, corner-cutting approach to safety that laid claim to, among others, the Texas City refinery and Prudhoe, Alaska incidents.

80.     As the investigations began to unfold, a May 27, 2010 article in *The Wall Street Journal* revealed that the investigations pointed to a series of missteps by BP "over the course of the project that rendered this well more vulnerable to the blowout[.]"

81.     *The Wall Street Journal* obtained documents belonging to BP and Transocean that revealed "BP … cut short a procedure involving drilling fluid that is designed to detect gas in the well and remove it before it becomes a problem … BP also skipped a quality test of the cement around the pipe – another buffer against gas – despite what BP now says were signs of problems with the cement job and despite a warning from cement contractor Halliburton Co."

82.     In addition, according to the Presidential Commission, BP's original design called for the use of 16 or more centralizers placed along the "long string" – a single continuous wall of steel between the wellhead and the seafloor to keep the casing in the center of the wellbore. However, on April 1, 2010, team member Brian Morel learned that BP's supplier had only six in stock.   Despite computer simulations run on BP proprietary software (called OptiCem) suggesting the need for more than six centralizers, BP Well Team Leader John Guide, based in BP's Houston office, opposed the use of additional centralizers because the installation would delay the team by approximately ten hours, costing BP additional money.  *The Wall Street Journal* identified an April 18, 2010 report from Halliburton to BP that "warned that if BP didn't

29

use more centering devices, the well would likely have 'a SEVERE gas flow problem' [but] BP decided to install fewer of the devices than Halliburton recommended – six instead of 21." BP ordered additional centralizers, but when they arrived on the *Deepwater Horizon*, it was determined that they were the wrong type and not used. The Company's approach was based more on convenience than science or engineering, deciding to use six centralizers simply because that was the number currently available on the rig.

83. Moreover, according to Company documents, BP cut short a common industry practice, called "bottoms up," that circulates drilling mud through the well, bringing the mud at the bottom all the way up to the drilling rig. This process, which should have taken about 12 hours to complete based on the drilling depth, allows workers to check the mud for gas influxes, remove gas pockets and remove any contaminants from the cement. According to *The Wall Street Journal* article, however, the mud circulation was done for a paltry 30 minutes.

84. *The Wall Street Journal* also revealed that "[o]ne of the final tasks was to cement in place the steel pipe that ran into the oil reservoir. The cement would fill the space between the outside of the pipe and the rock, preventing any gas from flowing up the sides."

85. The Presidential Commission determined that the crew finished pumping the primary cement job at 12:40 a.m. on April 20, 2010. A Halliburton crew member sent an email to a Halliburton engineer, stating "[w]e have completed the job and it went well."  A team of outside technicians was on hand to conduct a suite of tests on the well including, but not limited to, the "cement bond logs," which was designed to evaluate and test the sufficiency of the cement job by analyzing the casing's response to acoustic signals. However, BP decided to forego the acoustical test and sent the team of technicians home later that morning. This decision diverged sharply from industry practice and the recommended safe practices of the

30

American Petroleum Institute.

86.     *The Wall Street Journal* reported that some time after 5:00 p.m. on April 20, 2010, the workers conducted a "negative pressure test" to evaluate whether hydrocarbons were flowing into the well.  This critical test was overseen by BP well-site leader Robert Kaluza, whose experience was admittedly primarily in land drilling and who "told investigators that he was on the rig to 'learn about deep water.'"  The negative pressure test "initially strayed from the procedure spelled out in BP's permit … When the first test results indicated something might be leaking, workers repeated the test, this time following the permitted procedure.  The second time, pressure rose sharply, with witnesses saying that the well 'continued to flow and spurted.'"  In fact, the BP crew performed the test a third time and, as before, the pressure within the drill pipe spiked.  Finally, a fourth negative-pressure test yielded results that BP considered successful and so the crew continued with temporary abandonment.  Despite this, *The Wall Street Journal* noted that "[w]ell control experts say it's clear gas was leaking into the well, most likely through the seal at the top but possibly through the bottom or even through a collapsed pipe."

87.     In order to perform the negative-pressure tests, the crew had already removed approximately 3,300 feet of drilling mud below the seafloor and replaced it with lighter seawater. According to *The Wall Street Journal*, Transocean workers "disagreed with a decision by BP's top manager about how to remove drilling mud and replace it with lighter seawater[,]" leaving less weight to hold down any gas.  BP's opinion prevailed, but the Company subsequently "admitted a possible 'fundamental mistake' in concluding that it was safe to proceed with mud removal."

88.     The Presidential Commission Report noted that once the crewmembers "began displacing the riser with seawater at 8:02 p.m., they confronted the challenge of dealing with all

31

of the returning mud." The driller continuously rerouted the mud from one pit to another to deal with the heavy inflow while the crew also sent mud from other locations to the "active pit system." The Presidential Commission concluded that it was "not clear whether the driller, assistant drillers, or mudlogger could adequately monitor active pit volume (or flow-in versus flow-out) during that time given all of the activity."

89.     The situation remained uneventful until approximately 9:01 p.m., when drill pipe pressure began to creep slowly upward despite the fact that the pump rate remained constant. The Presidential Commission recognized that "[w]hile the magnitude of the increase may have appeared only as a subtle trend [on the display], the change of direction from decreasing to increasing was not …. One possible reason might have been that hydrocarbons were flowing into the well and pushing heavy drilling mud up past the drill pipe." The crew, however, did not respond to the pressure differential until about thirty minutes later when the driller ordered a crew member to bleed pressure from the drilling pipe.

90.     Around approximately 9:45 p.m., drilling mud began spewing onto the rig floor and, a few minutes later, the crew began its initial attempt to activate the BOP. This effort was ineffective, as gas was already above the BOP and shooting up the riser.

91.     According to the Presidential Commission Report, the first explosion occurred at 9:49 p.m., claiming its first victims on the drilling floor.

92.     After the first explosion, workers on the bridge acted to deploy the Emergency Disconnect System ("EDS"), which would have closed the blind shear ram, severed the drill pipe, sealed the well, and disconnected the rig from the BOP. However, the EDS failed and none of its remedial measures were activated.

93.     Despite the ineffectual EDS, the BOP's automatic "deadman switch" should have

32

triggered the blind shear ram, but that failed too.  Later inspections revealed that the device had myriad problems due to lack of inspection and poor maintenance, including low battery charges in the critical components responsible for deploying the blind shear ram and defective relays that supply the power to close the blind shear ram.

94.     In September 2010, BP's Accident Investigation Report on the *Deepwater Horizon* revealed that a BP rig audit team conducted an audit of the *Deepwater Horizon*, uncovering "[o]verdue maintenance in excess of 30 days was considered excessive, totaling 390 jobs and 3,545 man hours.  Many of the overdue routines were high priority."  According to BP's Accident Investigation Report, the audit "identified 31 findings that were related to the well control system maintenance.  Of these, six findings related to BOP maintenance; all findings were outstanding as of December 2009."  Moreover, according to an August 4, 2010 article in *The New York Times*, in March 2010, the month before the explosion, Transocean commissioned the risk management company Lloyd's Register to investigate certain operations in the Gulf of Mexico, including the *Deepwater Horizon*.  According to *The New York Times*, the investigators concluded that many crew members and front-line supervisors were hastily promoted without adequate on-the-job experience to appreciate the hazards, noting "[f]ront-line crews are potentially working with a mind-set that they believe they are fully aware of all the hazards when it is highly likely they are not."  Moreover, the analysis referred to at least 36 pieces of poorly maintained equipment that could "lead to loss of life, serious injury or environmental damage as a result of inadequate use and/or failure of equipment."

### B.     BP Was Completely Unprepared to Control the Oil Spill

95.     After the *Deepwater Horizon* explosion, it became readily apparent that BP's Regional OSRP was materially false and misleading when filed.  In fact, corroboration of this

began to leak out when, on May 10, 2010, defendant Suttles admitted that BP failed to have an oil spill response plan with "proven equipment and technology" in place that could contain the oil spill.  Correspondingly, in a November 9, 2010 interview with the BBC, Hayward ultimately confirmed that the Company had failed to draw up sufficient emergency response plans, conceding that "we were making it up day to day."

96.     In its OSRP for the Gulf, filed with the MMS on December 1, 2000, and subsequently revised on June 30, 2009, BP confidently declared that it had the capability to recover nearly 500,000 barrels of spilled oil per day in the Gulf region, rendering the worst case scenario for the Macondo well – a release of 162,000 barrels of oil per day – a relative certainty to contain.  BP's claim, however, would be quickly debunked after the *Deepwater Horizon* explosion.  In fact, the Presidential Commission found that despite BP's claims that it could recover nearly 500,000 bopd, "the oil-spill removal organizations were quickly outmatched."

97.     The Presidential Commission aptly leveled criticism at BP's Regional OSRP, as it fell woefully short of a "serious attention to detail."  As an example, it noted that the BP plan identified three different worst-case scenarios – *i.e.*, less than ten miles from the shoreline, more than ten miles from the shoreline, and from an exploratory well from offshore drilling – that ranged from 28,033 to 250,000 barrels of oil discharge and "used identical language to 'analyze' the shoreline impacts under each scenario[,]" despite a range of volatile factors.  In addition, half of the "Resource Identification" appendix (five pages) to the BP Regional OSRP was copied from material on the National Oceanic and Atmospheric Administration's ("NOAA") website, without any discernible effort to determine the applicability of that information to the Gulf of Mexico – nonsensically resulting in descriptions of "biological resources nonexistent in the Gulf – including sea lions, sea otters, and walruses."

34

98.    The Presidential Commission also noted several other errors in BP's OSRP such as:

- Naming Dr. Peter L. Lutz ("Lutz") from the University of Miami's School of Marine Sciences as a wildlife expert, despite the fact that he "had died several years before BP submitted its plan."  Not only had Lutz been deceased since 2005, but he left the University of Miami almost twenty years prior to chair the marine biology department at a different university;

- Including incorrect contact information for the Marine Spill Response Corporation ("MSRC") which, according to the Presidential Commission, was "BP's main oil-spill removal organization in the Gulf."  Tellingly, "a link in [BP's Regional OSRP] that purported to go to the Marine Spill Response Corporation website actually led to a Japanese entertainment site[;]"

- Listing the incorrect names and phone numbers of several Texas A&M University marine specialists; and

- Listing outdated contact information for certain mammal stranding network offices in Louisiana and Florida, some of which were actually closed.

99.    As detailed above, without a legitimate OSRP primed for action, BP had to resort to a scattershot approach in the midst of an environmental cataclysm to stanch the flow of oil in the Gulf – clearly incongruous to what it had represented.

100.    Within hours after the *Deepwater Horizon* explosion, on April 21, 2012, BP commenced efforts to use remotely operated vehicles ("ROVs") to seal off the well.  First, BP used ROVs to conduct a "hot stab," in which hydraulic pressure is applied to a control panel for the blind shear ram.  BP's attempts to engage the blind shear ram, however, were ineffective and, by May 5, 2010, BP learned that the hot stab procedure had no probability of success because the control panel was actually attached to a non-operative test ram.  Second, BP directed the ROVs to cut electrical wires in the blind hope that the BOP's "deadman switch" would be triggered and deploy the ram by activating the well's autoshear system, an emergency mechanism that automatically seals the well when the riser disconnects from the BOP.  All of BP's attempts to

seal the well with ROVs failed miserably.

101.    With the failed attempts to use ROVs to seal the well behind them, on April 22, 2010, BP began spraying massive amounts of the dispersant "Corexit" on the oil that had reached the surface of the Gulf of Mexico.  As an unprecedented volume of dispersants were sprayed on the surface, BP brought up the concept of applying dispersant directly to the well.  However, no federal agency has ever allowed the use of dispersants in the deepwater environment and the EPA ultimately rejected BP's use of dispersants altogether.

102.    Knowing that dispersants would be unable to significantly lessen the environmental catastrophe, BP's next effort – which was noticeably absent from BP's Regional OSRP – was to place a large containment dome or "cofferdam" over the larger of the two leaks, with a pipe at the top channeling oil and gas to a ship on the surface of the Gulf of Mexico, the *Discoverer Enterprise*.  BP had several cofferdams already, but those had been designed, and had only been utilized, in shallow water scenarios and had never been tested in a similar deepwater environment.  Thus, BP was forced to quickly attempt to modify one of its existing cofferdams for these new and unintended purposes.  The makeshift cofferdam was modified on or about May 4, 2010 and, within days, on May 6, 2010, BP began to lower the 98-ton dome to the sea floor late in the evening.

103.    BP was grasping at straws, as it was aware that the likelihood that the improvised cofferdam would contain the spill was remote.  In fact, the Presidential Commission Report noted:

> BP's Suttles publicly cautioned that previous successful uses had been in much shallower water.  BP recognized that chief among potential problems was the risk that methane gas escaping from the well would come into contact with cold sea water and form slushy hydrates, essentially clogging the cofferdam with hydrocarbon ice.  Notwithstanding the uncertainty, BP, in a presentation to the

leadership of the Department of Interior, described the probability of the containment dome's success as "Medium/High."  Others in the oil and gas industry were not so optimistic: many experts believed the cofferdam effort was very likely to fail because of the hydrates.

104.    Sure enough, the effort failed.  As many experts predicted, when crews started to maneuver the cofferdam into position on May 7, 2010, hydrates formed before BP could place the dome over the leak, clogging the opening through which oil was to be funneled.  While BP had a plan to deal with hydrates once the cofferdam was in place, it had no similar strategy to deal with hydrate formation during installation.  This error in planning almost led to another catastrophe.  As noted by the Presidential Commission:

> Because hydrocarbons are lighter than water, the containment dome became buoyant as it filled with oil and gas while BP tried to lower it.  BP engineers told [the Company's Vice President overseeing the project Richard] Lynch that they had "lost the cofferdam" as the dome, full of flammable material, floated up toward the ships on the ocean surface.  Averting a potential disaster, the engineers were able to regain control of the dome and move it to safety on the sea floor.  In the wake of the cofferdam's failure, one high-level government official recalled Andy Inglis, BP's Chief Executive Officer of Exploration and Production, saying with disgust, "If we had tried to make a hydrate collection contraption, we couldn't have done a better job."

105.    In his book on the *Deepwater Horizon* incident published in late 2010, entitled "Disaster on the Horizon," former drilling engineer Bob Cavnar ("Cavnar") described the initial containment dome effort as the "silliest contraption" that BP built in the aftermath of the incident, and that the steps to construct and lower it down to the leaking BOP "never made much sense ... they were more for show – to look like they were doing something while they were trying to come up with a real plan."  Cavnar stated in an interview that the cofferdam was "destined to fail" due to the "scientific certainty" that gas hydrates would immediately form in the device and clog it, and describes in his book the results of its deployment as "almost instantaneous failure."

37

106.    Following the failed cofferdam effort, BP attempted to plug the surging oil by embarking on so-called "top kill" and "junk shot" efforts – industry techniques that have been historically met with mixed results – and which were ominously missing from BP's Regional OSRP.

107.    A top kill involves pumping heavy mud into the top of the well through the BOP's choke and kill lines, at rates and pressures high enough to force escaping oil back down the well and into the reservoir.   A junk shot complements a top kill and involves pumping material (including pieces of tire rubber and golf balls) into the bottom of a BOP through the choke and kill lines.  The material is supposed to get caught on obstructions within the BOP and impede the flow of oil and gas making it easier to execute a top kill.  However, as acknowledged by the Presidential Commission, neither technique "had [] ever been used in deepwater."  For example, in 1979, after a semi-submersible oil rig exploded releasing millions of gallons of oil into the Gulf of Mexico, the top kill and junk shot methods had taken nearly 290 days to control the oil spill that occurred in shallow waters.

108.    BP proceeded with its top kill and junk shot plan on May 26, 2010, but, as with its previous efforts, communicated mixed messages about the potential likelihood of success to both the government and the public.   BP's ineffectual effort to piece together a coherent and straightforward message about its efforts to contain the oil spill did not escape the notice of the Presidential Commission:

> As with the cofferdam, BP struggled with public communications surrounding the top kill.  At the time, both industry and government officials were highly uncertain about the operation's probability of success.  One MMS employee estimated that probability as less than 50 percent, while a BP contractor said that he only gave the top kill a "tiny" chance to succeed.  But BP's Hayward told reporters, "We rate the probability of success between 60 and 70 percent."   After the top kill failed, that prediction may have lessened public

confidence in BP's management of the effort to contain the well.

109.    During three separate attempts over the next three days, BP pumped mud at rates exceeding 100,000 barrels per day and fired numerous shots of "junk" into the BOP.  After the third unsuccessful attempt, BP acknowledged that the plan was a failure, citing the risk of a possible collapse of the three sets of weak points, or "rupture disks," in the well's 16-inch casing.

110.    The Presidential Commission, however, was not completely convinced by BP's explanation, noting that the "[c]ollapse of the rupture disks was only one of BP's possible explanations for the unsuccessful top kill. But the company presented it to the government as the most likely scenario."  Moreover, the Presidential Commission recognized that the "government science teams did not fully accept BP's analysis of what happened to the mud" and, in contrast, "government officials have suggested that the top kill likely failed because the rate at which oil was flowing from the well was many times greater than the then-current 5,000 barrels-per day estimate.  Because BP did not pump mud into the well at a rate high enough to counter the actual flow, oil and gas from the well pushed mud back up the BOP and out of the riser."

111.    Following the failed top kill and junk shot strategy, on May 29, 2010, BP announced that it would attempt to cut off the portion of the riser still attached to the top of the BOP and install a collection device, known as a "top hat," which would then be connected *via* a new riser to the *Discoverer Enterprise* vessel.  Not surprisingly, BP's Regional OSRP was devoid of any reference to the top hat technique as a potential remedy in the event of an oil spill.

112.    According to the Presidential Commission Report, BP began installing the top hat on June 1, 2010, and had it in place by June 3, 2010.  By June 8, 2010, the *Discoverer Enterprise* was collecting about 15,000 bopd.

113.    In conjunction with the top hat method, BP developed a system to bring oil and gas to the surface through the choke line on the BOP by outfitting a vessel called the *Q4000* with collection equipment, including an oil and gas burner imported from France.  Similar to BP's other post-spill cleanup efforts, using a vessel, such as the *Q4000*, was also noticeably absent from BP's Regional OSRP.

114.    After some, albeit limited, success, BP was, in the words of the Presidential Commission, once again "overly optimistic about the percentage of the oil it could remove or collect."  The Presidential Commission noted:

> On June 1, Suttles said that he expected the top hat, when connected to the *Discoverer Enterprise*, to be able to collect the "vast majority" of the oil.  Within days, it became apparent that the top hat and *Discoverer Enterprise* were inadequate.  On June 6, Hayward told the BBC that, with the *Q4000* in place, "we would very much hope to be containing the vast majority of the oil."  But when the *Q4000* came online in mid-June, the two vessels' joint capacity of 25,000 barrels per day was still insufficient.

115.    Following the failure to contain most of the oil using the top hat, the U.S. Coast Guard continued questioning BP's response to the spill.  The Presidential Commission recognized that:

> BP's Lynch said that the speed at which the company brought capacity online was limited solely by the availability of dynamically positioned production vessels.  One senior Coast Guard official challenged BP's definition of availability: he suggested that BP did not consider options such as procuring ships on charter with other companies until the government pushed it to do so.  Obtaining another production vessel might have enabled BP to collect oil through the BOP's kill line at a rate comparable to that of the *Q4000*.

116.    Following the limited success of the top hat procedure, BP began presenting its final well-control plans to government experts.    According to the Presidential Commission Report:

> The [U.S. government] science advisors would question BP's assumptions,

forcing it to evaluate worst-case scenarios and explain how it was mitigating risk.  The government saw its pushback as essential because BP would not, on its own, consider the full range of possibilities.  According to one senior government official, before the increased supervision, BP "hoped for the best, planned for the best, expected the best."  [Paul] Tooms, BP's Vice President of Engineering, believed that the government science advisors unnecessarily slowed the containment effort, arguing that scientists consider risk differently than engineers and that BP had expertise in managing risk.  BP, however, was not in the best position to tout that expertise: its well had just blown out.

117.    On June 10, 2010, the Associated Press published an article entitled "BP Spill Response Plans Severely Flawed," which detailed the "glaring errors and omissions in BP's oil spill response plans."  The article, in relevant part, provided:

[BP's] 582-page regional spill plan for the Gulf, and its 52-page, [IEP] ... vastly understate the dangers posed by an uncontrolled leak and vastly overstate the company's preparedness to deal with one, according to an Associated Press analysis.

*       *       *

In the spill scenarios detailed in the documents, fish, marine mammals and birds escape serious harm; beaches remain pristine; water quality is only a temporary problem.  And those are the projections for a leak about 10 times worse than what has been calculated for the ongoing disaster.

*       *       *

The plans contain wildly false assumptions about oil spills.  BP's proposed method to calculate spill volume judging by the darkness of the oil sheen is way off.  The internationally accepted formula would produce estimates 100 times higher.

*       *       *

In early May, at least 80 Louisiana state prisoners were trained to clean birds by listening to a presentation and watching a video.  It was a work force never envisioned in the plans, which contain no detailed references to how birds would be cleansed of oil.

*       *       *

There are other examples of how BP's plans have fallen short:

41

Beaches where oil washed up within weeks of a spill were supposed to be safe from contamination because BP promised it could marshal more than enough boats to scoop up all the oil before any deepwater spill could reach shore – a claim that in retrospect seems absurd.

"The vessels in question maintain the necessary spill containment and recovery equipment to respond effectively," one of the documents says.

BP asserts that the combined response could skim, suck up or otherwise remove 20 million gallons of oil each day from the water.  But that is about how much has leaked in the past six weeks and the slick now covers about 3,300 square miles, according to Hans Graber, director of the University of Miami's satellite sensing facility.  Only a small fraction of the spill has been successfully skimmed.  Plus, an undetermined portion has sunk to the bottom of the Gulf or is suspended somewhere in between.

The plan uses computer modeling to project a 21 percent chance of oil reaching the Louisiana coast within a month of a spill.  In reality, an oily sheen reached the Mississippi River delta just nine days after the April 20 explosion.  Heavy globs soon followed.  Other locales where oil washed up within weeks of the explosion were characterized in BP's regional plan as safely out of the way of any oil danger.

BP's site plan regarding birds, sea turtles or endangered marine mammals ("no adverse impacts") also have proved far too optimistic.

While the exact toll on the Gulf's wildlife may never be known, the effects clearly have been devastating.

More than 400 oiled birds have been treated, while dozens have been found dead and covered in crude, mainly in Louisiana but also in Mississippi, Alabama and Florida. More than 200 lifeless turtles, several dolphins and countless fish also have washed ashore.

The response plans anticipate nothing on this scale.  There weren't supposed to be any coastline problems because the site was far offshore.

"Due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected," the site plan says.

*       *       *

Perhaps the starkest example of BP's planning failures: The company has insisted that the size of the leak doesn't matter because it has been reacting to a worst-case

42

scenario all along.

Yet each step of the way, as the estimated size of the daily leak has grown from 42,000 gallons to 210,000 gallons to perhaps 1.8 million gallons, BP has been forced to scramble to create potential solutions on the fly, to add more boats, more boom, more skimmers, more workers. And containment domes, top kills, top hats.

While a disaster as devastating as a major oil spill will create unforeseen problems, BP's plans do not anticipate even the most obvious issues, and use mountains of words to dismiss problems that have proven overwhelming.

118. On July 9, 2010, the U.S. Coast Guard authorized BP to install a "capping stack," a smaller version of a BOP that was designed to sit atop the BOP and stop the flow of oil, but required BP to wait for additional tests before sealing it.

119. The capping stack was finally installed on July 12, 2010.  On the following day, experts conducted a "well integrity test" to determine if the well had been compromised and to see whether oil could flow into the rock formation.   According to the Presidential Commission, "[t]he test was to last from 6 to 48 hours, and BP had to monitor pressure, sonar, acoustic, and visual data continuously, as recommended by the [U.S. government's] Well Integrity Team."

120. On July 15, 2010, after a 24-hour delay to repair a leak, BP shut the capping stack and began the well integrity test.  For the first time in 87 days – and after approximately five million barrels of oil had already seeped into the Gulf of Mexico – the well had finally stopped surging.

121. Just days later, on July 19, 2010, BP sought authorization to kill the well through a procedure called a "static kill" which involved pumping heavy drilling mud into the well in a process similar to the top kill.  However, because the oil and gas were already static, the pumping rates required for the static kill to succeed were far lower than the top kill.  There was

43

also a concern about the amount of pressure a static kill would put on the well.  Despite these issues, on August 2, 2010, the U.S. government approved the procedure.  By late morning on the following day, the static kill appeared to have worked.  On August 8, 2010, retired Coast Guard Admiral Thad Allen reported that the cement had been pressure-tested and was holding.

122.    In mid-September 2010, the first relief well – which BP had begun to drill in early May – finally intercepted the Macondo well, allowing BP to pump in cement and permanently seal the reservoir.  As a result, on September 19, 2010, the U.S. government finally announced that "the Macondo well is effectively dead."  According to the Presidential Commission Report, the U.S. government's first public estimate of the oil discharged during the spill was roughly 4.9 million barrels.

## VI.    DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE RELEVANT PERIOD

123.    Before the start of the Relevant Period, BP experienced a series of high-profile safety lapses, including the 2005 Texas City refinery explosion, that resulted in the loss of life, damage to the environment, harm to BP's reputation, and significant costs to BP in the form of criminal pleas and fines, civil settlements, and remediation expenses. Responding to these concerns, beginning in June 2005, BP sought to assure its investors that it was a Company committed to safety as its "number one priority."

124.    On June 30, 2005, the Company filed its Annual Report with the SEC on Form 20-F, which contained, among other things, a pledge that BP had implemented protocols to ensure regulatory and safety compliance by all employees.  BP further confirmed that it sought to conduct its activities in such a manner that there is no or minimal damage to the environment. The Company's Form 20-F stated, in relevant part:

BP operates in over 100 countries worldwide.  In all regions of the world, BP has processes to ensure compliance with applicable regulations.  In addition, each individual in the Group is required to comply with the BP health, safety and environment policy and associated expectations and standards.  Our partners, suppliers and contractors are also encouraged to adopt them.

*       *       *

Deepwater Gulf of Mexico is one of our new profit centres and our largest area of growth in the United States.

125.   To demonstrate its newfound commitment to process safety, on August 17, 2005, BP issued a press release to announce that it was "appoint[ing] an independent panel to review the safety management systems and corporate safety culture" of BP's subsidiary responsible for its U.S. refining operations.  Lord Browne was quoted as saying "the Texas City explosion was the worst tragedy in the recent history of BP, and we will do everything possible to ensure nothing like it happens again.  Today's recommendation from the CSB is a welcome development and we take it seriously."

126.   Indeed, on October 24, 2005, BP issued a press release announcing the formation of the Baker Panel "to review and make recommendations for improvement of safety management systems and corporate safety culture at BP Products North America, Inc."  Lord Browne publicly praised the Baker Panel's willingness to accept the assignment, pledging BP's "full support and cooperation."  With respect to process safety going forward, BP continued its charade as Lord Browne vowed that "[w]e are determined to do everything possible to prevent a tragedy like this from ever happening again by ensuring that safety practices at our operations are effective and comprehensive. This inquiry is a vital part of that effort."  The Baker Panel's charter revealed that it was delegated the authority to examine and recommend any needed improvements to:

45

- Corporate safety oversight, including the safe management of refineries obtained through mergers and acquisitions;

- Corporate safety culture, including the degree to which:

  o Corporate officials exercise appropriate leadership to promote adherence to safety management systems;

  o Process safety is effectively incorporated into management decision-making at all levels;

  o Employees at all levels are empowered to promote improved process safety; and

  o Process safety programs receive adequate resources and are appropriately positioned within organizational structures.

- Corporate and site safety management systems, specifically:

  o Near miss reporting and investigation programs;

  o Mechanical integrity programs;

  o Hazard analysis programs, management-of-change programs, and up to date operating procedures for processes with catastrophic potential; and

  o Siting policies for occupied structures near hazardous operating units.

127.   The foregoing statements, which caused BP securities to trade at artificially inflated prices, were false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, because BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk and, as the Presidential Commission Report found, BP lacked "consistent and reliable risk-management processes."  For example, BP failed to institute procedures to reduce the risk of accidents occurring at its rigs, including the *Deepwater Horizon*, despite being aware of the specific dangers tied to executing cement jobs in the course of deepwater drilling.

46

Moreover, the fact that the *Deepwater Horizon* disaster and prior disasters, such as at Texas City, resulted from the same cost-saving, corner-cutting approach to safety, demonstrates that BP did not apply any knowledge it gained from the Texas City disaster across its operations, nor did it have effective measures to reduce oil spills.

128.    On February 6, 2006, defendant Sutherland signed his "Chairman's Letter," which was disseminated to BP shareholders as part of the Company's Annual Review.  In this letter, defendant Sutherland stated that "the ethics and environment assurance committee under Walter Massey's chairmanship enhanced its focus in the area of personal and process safety procedures in the light of the Texas City incident."  Defendant Sutherland further stated that "[w]hile the board evaluation exercise we undertook this year indicated areas in which our practices should develop, the internal and external endorsement our board has received reassures us that the governance of your company is state-of-the-art."  The Annual Review asserted that the Company was applying its "best practices," which provides that "[a]s part of our approach to improve continuously, BP has been putting in a system to adopt the principles of a high-reliability organization within our refining operations.  Across the group, we have also been implementing a new integrity management standard.  Developed by a team of operations, maintenance and engineering experts from across BP, our new standard combines and improves a number of existing safety processes and technical practices."  In fact, BP asserted that "[w]e have learned much from the actions and failures identified in Texas City, and are now applying that knowledge widely across BP's operations."  Moreover, BP deceived the market by asserting that it had measures in place to reduce oil spills:  "One measure of our long-term track record on integrity management is our performance on reducing oil spills, most of which occur on land."

129.    The foregoing statements, which caused BP securities to trade at artificially

inflated prices, were false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, because BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk and, as the Presidential Commission Report found, BP lacked "consistent and reliable risk-management processes."  For example, BP failed to institute procedures to reduce the risk of accidents occurring at its rigs, including the *Deepwater Horizon*, despite being aware of the specific dangers tied to executing cement jobs in the course of deepwater drilling. Moreover, the fact that the *Deepwater Horizon* disaster and prior disasters, such as at Texas City, resulted from the same cost-saving, corner-cutting approach to safety, demonstrates that BP did not apply any knowledge it gained from the Texas City disaster across its operations, nor did it have effective measures to reduce oil spills.

130.    On January 16, 2007, BP issued a press release announcing the release of the Baker Report and stated that "BP already has taken a number of actions which align the recommendations of the BP US Refineries Independent Safety Review Panel and will, after a more thorough review, develop plans for additional action at its U.S. refineries and for applying lessons learned elsewhere."

131.    The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading because Defendants knew or recklessly disregarded the fact that BP was expanding its deepwater drilling operations without implementing the recommendations by the Baker Panel to improve process safety or instituting sufficient operational protocols and safety standards necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk.  For example, BP failed to institute

procedures to reduce the risk of accidents occurring at its rigs, including the *Deepwater Horizon*, despite being aware of the specific dangers tied to executing cement jobs in the course of deepwater drilling. Moreover, the fact that the *Deepwater Horizon* disaster was strikingly similar to prior disasters at Texas City and Prudhoe Bay demonstrates that BP was not making progress in implementing the recommendations of the Baker Panel. As the Presidential Commission found, BP lacked "consistent and reliable risk management processes."

132.    Likewise, on March 6, 2007, BP filed its Annual Report with the SEC on Form 20-F, which again reaffirmed the Company's commitment to implementing the Baker Panel's recommendation:

> The panel made 10 recommendations relating to: process safety leadership; integrated and comprehensive process safety management system; process safety knowledge and expertise; process safety culture; clearly defined expectations and accountability for process safety; support for line management; leading and lagging performance indicators for process safety; process safety auditing; board monitoring; and industry leader. The panel's report in its entirety can be found at *www.bp.com/ bakerpanelreport.*

> The panel acknowledged the measures BP had taken since the Texas City incident, including dedicating significant resources and personnel intended to improve the process safety performance at BP's US refineries. BP has committed to implement the panel's recommendations and will consult with the panel on how best to do this across the US refineries and to apply the lessons learned elsewhere in its global operations.

133.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading because Defendants knew or recklessly disregarded the fact that BP was expanding its deepwater drilling operations without implementing the recommendations by the Baker Panel to improve process safety or instituting sufficient operational protocols and safety standards necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk. For example, BP failed to institute

procedures to reduce the risk of accidents occurring at its rigs, including the *Deepwater Horizon*, despite being aware of the specific dangers tied to executing cement jobs in the course of deepwater drilling.   Moreover, the fact that the *Deepwater Horizon* disaster was strikingly similar to prior disasters at Texas City and Prudhoe Bay demonstrates that BP was not making progress in implementing the recommendations of the Baker Panel.   As the Presidential Commission found, BP lacked "consistent and reliable risk management processes."

134.    In its Sustainability Report for 2006 (dated April 2007), BP stated that as part of its operating management system ("OMS"), "[w]e [BP] document and rigorously follow procedures for safe and effective operating."  The Sustainability Report was publicly released by BP on May 9, 2007.

135.    The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading when made, and was known by Defendants to be false at that time, or was made with reckless disregard for the truth.  Contrary to its public statements, BP did not have adequate documented procedures for its operations, and in particular did not have adequate written procedures for controlling a well during drilling.  For example, BP failed to document how to perform a negative pressure test or interpret the results of that test, despite the fact that this was a critical test for assessing the integrity of the well and the only test that could assess the adequacy of the cement job at the bottom of a well.  Moreover, Defendants knew that the foregoing statement was false and misleading because at the same time BP was retaliating against workers who reported safety violations through the Company's established channels.

136.    On May 16, 2007, defendant Malone testified before the U.S. House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and

Investigations.  In his written statement to the Committee, Malone falsely claimed that:

> BP America is committed to safety, and the expectation of our management is that budget guidelines should never result in a compromise in safety performance. That is and has long been our philosophy ....

*      *      *

> I continue to meet with employees to reinforce my expectations of them: that they must ensure that our operations are safe, that they understand they have both a right and responsibility to shut down any process they feel is unsafe or operationally unsound, and that they are encouraged to raise concerns on any issue.

*      *      *

> BP does not tolerate retaliation against workers who raise safety concerns.

137.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, because BP did retaliate against workers who raised safety concerns through the Company's established channels.  For example, Abbott, a BP engineer working on design and blueprint management issues relating to the operations of BP's *Atlantis* rig, raised concerns with BP managers about the Company's practices and policies for managing and updating designs and blueprints for its infrastructure and equipment on the *Atlantis* from November 2008 through January 2009. Abbott was fired in retaliation for his whistle-blowing.

138.    On September 25, 2007, Defendant Inglis spoke at the Sanford Bernstein 4th Annual Strategic Decisions Conference and misleadingly stated:  "One aspect of our focus on safe and reliable operations that I mentioned earlier is our new standardized Operating Management System (OMS).  This will provide a blueprint for safety and *all aspects of operations throughout BP*."  This statement, which caused BP securities to trade at artificially

51

inflated prices, was false or misleading when made, and was known by Defendants to be false at that time, or was made with reckless disregard for the truth, because, as revealed in testimony in 2010 and the Presidential Commission Report, BP's OMS did not provide a common framework for "all aspects" of BP's safety operations around the world.  Rather, it allowed BP to use differing safety practices country-by-country and to satisfy only minimal safety standards set by local regulations, a far cry from the exacting safety standards it told investors it was using.

139.    On October 25, 2007, BP issued a press release announcing the resolution of various law enforcement investigations, including those relating to the Texas City refinery explosion and the Prudhoe Bay oil spill.  The press release quoted defendant Malone, stating, in part, that: "[i]n the months and years since these violations occurred, we have made real progress in the areas of process safety performance and risk management."  The press release also claimed that "BP America is in the midst of a comprehensive effort to improve its safety culture and to strengthen and standardize process safety and risk management programs at all BP-operated facilities."

140.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, because BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk and, as the Presidential Commission Report found, BP lacked "consistent and reliable risk-management processes."    Additionally, Malone misrepresented the true risks associated with deepwater drilling in that he failed to disclose the multiple safety failures and

52

near-failures that BP had experienced in its deepwater drilling operations, rendering his statement materially false and misleading.  Moreover, BP's cost-saving, corner-cutting approach to safety that led to the *Deepwater Horizon* disaster and laid claim to the previous disasters at the Texas City Refinery and Prudhoe Bay shows that BP was not making "real progress in the areas of safety performance and risk management."

141.   On November 8, 2007, defendant Hayward spoke at the Houston Forum about BP's supposed commitment to process safety and about the Company's ability to successfully operate at the industry's "frontiers," which included the Gulf of Mexico.   During his presentation, defendant Hayward stated, in part, as follows:

> We continue to implement the roadmap provided to ourselves and the industry by the excellent work of the Baker Panel. BP remains absolutely committed to taking these lessons and becoming a world leader in process safety.

142.   The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, because Hayward misrepresented BP's absolute commitment to process safety when, in fact, BP was not so committed and was instead expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk.  Hayward also misrepresented the true risks associated with deepwater drilling in that he failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations, rendering his statements materially false and misleading.

143.   On February 22, 2008, BP released its 2007 Annual Review, which emphasized that the Company remained committed to process safety.  Indeed, the strength

of the safety message and level of priority given to it was reflected by the report's cover page, which read:

Our key priorities<br>
Safety<br>
People<br>
Performance

144.   The 2007 Annual Review also contained statements related to safety and risk management:

> In safety, we are significantly lowering the risk profile of our operations. We are working hard to ensure that we have the right people with the right skills in the right places. And we are addressing performance by reducing organizational complexity, improving operational consistency and changing individual behaviours. On the front lines of our business, we are moving this agenda forward.

*      *      *

> Process safety

>> Throughout 2007, BP continued to progress the process safety enhancement programme initiated in response to the March 2005 incident at the Texas City refinery. We have made progress across the group on all the recommendations:

>> • Leadership - We have consistently communicated that safe and reliable operations are our highest priority. Our safety and operations audit group was strengthened and completed 28 audits in 2007.

>> • Management systems - Implementation of our operating management system began at an initial group of sites, which included all five US refineries.

>> • Knowledge and expertise - We established an executive-level training programme, ran process safety workshops and launched an operations academy for site-based staff to enhance process safety capability. Specialists have been deployed at our US refineries to accelerate priority improvement programmes.

>> • Culture - To reinforce the need for a stronger safety culture, we undertook in-house assessments of BP's safety culture, supported by communication from leadership.

54

> • Indicators - Progress has been made in developing leading and lagging indicators, building on metrics already reported to executive management. We are working with the industry to develop indicators and this already includes progress to agree a metric covering loss of primary containment.

145.    The 2007 Annual Review contained the "Group chief executive's review," signed by defendant Hayward. In his Executive Review, defendant Hayward assured investors that, under his leadership, safety was BP's top priority.  For example, he stated, in part, as follows: "[w]hen I took over as group chief executive, the immediate task was to restore the integrity and the efficiency of BP's operations. I set out three priorities: safety, people and performance."  Defendant Hayward further explained that BP's new OMS brings "greater consistency to [BP's] operations" regardless of where those operations were occurring.

146.    The foregoing statements in the 2007 Annual Review, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)    Defendants falsely portrayed BP's operations as having a lower "risk profile" when, in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk;

(b)    Defendants misrepresented the true risks associated with deepwater drilling in that they failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations, rendering their statements materially false and misleading;

(c)     Defendants falsely represented that BP's OMS was "improving operational consistency" when, in fact, BP set differing safety practices country-by-country in order to save time and money; and

(d)     Defendants misrepresented BP's professed commitment to safety, as they failed to disclose that BP was implementing safety budget cuts and staff reductions that impacted the Company's ability to safely drill in the Gulf of Mexico.

147.    On February 27, 2008, BP conducted its 2008 Strategy Presentation during a conference call with investors and analysts.  There, BP executives, including defendant Hayward, asserted that safety was BP's top priority and claimed that the Company was able to deliver strong performance while maintaining safe operations. More specifically, these Defendants stated, in part, as follows:

> [Hayward:] 2007 saw further improvement in our overall safety performance. Over the last eight years, our safety performance, measured by Recordable Injury Frequency Rate, the standard measure of safety in our industry, has improved three-fold. As you can see on this chart, our performance is amongst the best in our industry.
>
> Notwithstanding this track record, our intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations.  Integrity-related incidents have fallen significantly over the last three years, and oil spills of more than one barrel continue a strong downward trend.
>
> Safe and reliable operations remain our number one priority.
>
> *       *       *
>
> [Hayward:] We are taking action to close the competitive gap through a focused effort on three priorities of safety, people and performance. We are determined to operate safely and reliably, to develop the capability of our people and to drive performance through restoring operational momentum. At the same time we are rigorously reducing complexity and cost. In Exploration and Production, we continue to see the benefits of our strategy.

> Our resource base, even as it stands today, underpins the potential to sustain production of at least four million barrels a day out to 2020. We will do better than this as we continue to pursue new access and deliver further exploration success.

148.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, because Hayward misrepresented BP's absolute commitment to process safety when, in fact, BP was not so committed and was instead expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk.  Hayward also misrepresented the true risks associated with deepwater drilling in that he failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations, rendering his statements materially false and misleading. Moreover, the fact that the *Deepwater Horizon* disaster was so similar to the previous disasters at the Texas City Refinery and Prudhoe Bay shows that BP was not making "real progress in the areas of safety performance and risk management."

149.    On April 17, 2008, defendant Hayward and BP Chairman Peter Sutherland delivered speeches at the Company's 2008 Annual General Meeting. BP posted transcripts of the speeches on its publicly-accessible website. In his speech, Hayward again asserted that safety was of the utmost importance at BP and distinguished BP from other oil companies based on its deepwater operations. In particular, Hayward stated, in part, as follows:

> When I took over as chief executive last May, I said that we would focus on three basic priorities: safety, people, and performance. Everyone at BP understands those priorities. And while I am in this role they will remain the priorities.
>
> Safety is our number one priority and in 2007 our overall safety record

57

continued to improve. Over the last eight years our safety performance according to the standard industry measure has improved threefold and is now among the best in our industry.

Our intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations. This is aimed at ensuring that our operations across the world look and feel the same everywhere - and perform to the same high standard.

*       *       *

International oil companies have always operated on the frontiers of the industry. And that is where BP is happiest, doing the tough stuff that others cannot or choose not to do. From our roots in those Edwardian days when the company was formed, prospecting for oil among the dunes of Persia - it is the same frontier spirit that is evident today as we develop the deepwaters of Angola, the Gulf of Mexico and Egypt[.] ...

Today, we continue to push technological frontiers, exploiting tight gas, increasing reserves through enhanced oil recovery techniques, developing advanced seismic imaging techniques and pioneering research into the next generation of biofuels - which will be based on more efficient molecules and will not be derived from food crops ....

So - the frontier is where our role is. It is by pushing the energy frontier, by moving into new markets and new geographies and by applying our know-how and new technology, that BP has for almost one hundred years generated its returns.

150.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, because Hayward misrepresented BP's absolute commitment to process safety when, in fact, BP was not so committed and was instead expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk. Hayward

58

also misrepresented the true risks associated with deepwater drilling in that he failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations, rendering his statements materially false and misleading. Moreover, the fact that the *Deepwater Horizon* disaster was so similar to the previous disasters at the Texas City Refinery and Prudhoe Bay shows that BP was not making "real progress in the areas of safety performance and risk management."

151.    On December 17, 2008, defendant Hayward gave a speech at the HRH Prince Of Wales' 3rd Annual Accounting for Sustainability Forum.  BP posted a transcript of the speech on its publicly-accessible website. Hayward claimed that BP was continuing to improve its process safety practices.  More specifically, defendant Hayward stated, in part, as follows:

> BP had a number of high-profile safety lapses in recent years, notably at our Texas City refinery, where there was tragic and unacceptable loss of life.
>
> These lapses exposed shortcomings – but they also gave us a huge opportunity to learn and improve the way we operate.  We opened ourselves up to scrutiny – and we listened more to our front-line operations people – who, of course, really know what is going on the ground.  And we have continuously reported progress against a response plan and against an independent external report.
>
> One of the many consequences for us has been to develop and to embed a new Operating Management System right across BP – and we operate in 100 countries – so that is no mean feat.
>
> The critical aspect of this system is that it actually translates words into action.  It starts out as a set of requirements which are the platform for safe, reliable, responsible operating activities.   And then we continuously improve what we do, every day, every month, every year – in pursuit of sustainable operating excellence.  Importantly, it is developed, implemented and sustained locally in our operating businesses – and makes our leaders locally fully-accountable for what they do.

152.    The foregoing statements created the false impression of consistent progress in

safety processes, a potent OMS, and thus, safe, reliable and responsible deep sea drilling operations, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made or included material omissions, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     An internal BP strategy document issued in December 2008 warned BP executives of "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents, which, therefore, increased the likelihood and severity of "process-safety related incidents";

(b)     Hayward misrepresented that BP did not tolerate any retaliation against workers who raised safety concerns when, in fact, BP engaged in a pattern of systematic retaliation against workers who reported safety violations; and

(c)     Hayward misrepresented BP's professed commitment to safety in that he failed to disclose that BP was implementing safety budget cuts and staff reductions which impacted BP's ability to safely drill in the Gulf of Mexico, rendering his statements materially false and misleading.

153.     In a February 2009 presentation before the Microsoft Global Energy Forum, BP stated that as part of its OMS, "We [BP] document and rigorously follow procedures for safe and effective operating."  The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading when made, and was known by Defendants to be false at that time, or was made with reckless disregard for the truth. Contrary to its public statements, BP did not have adequate documented procedures for its operations, and in particular did not have written procedures for controlling a well during drilling.  For example, BP failed to

document how to perform a negative pressure test or interpret the results of that test, despite the fact that this was the only test that could assess the integrity of the cement job at the bottom of a well.

154.    On March 10, 2009, BP's IEP, which discussed BP's purported safety protocol for the Mississippi Canyon Block 252, was "deemed submitted" by the MMS.  The document was initially received by the MMS on February 23, 2009, and became available to the public and BP's investors no later than March 10, 2009.  The document falsely stated, in part, that:

> I hereby certify that BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such discharge, resulting from the activities proposed in our Exploration Plan.
>
> *       *       *
>
> An accidental oil spill that might occur as a result of the proposed operation in Mississippi Canyon Block 252 has the potential to cause some detrimental effects to fisheries.  However, it is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities.  If such a spill were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be sublethal and the extent of damage would be reduced to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds.  No adverse activities to fisheries are anticipated as a result of the proposed activities.
>
> *       *       *
>
> In the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses, implementation of BP's Regional Oil Spill Response Plan which address available equipment and personnel, techniques for containment and recovery and removal of the oil spill.

155.    In addition, the IEP stated that:

> An accidental oil spill from the proposed activities could cause impacts to beaches. However, due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.  Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIA/EA MMS 2002-052

indicate there is little risk of contact or impact to the coastline and associated environmental resources.

156.    The Macondo IEP also contained identical statements to those set forth in the immediately preceding paragraph, except that they pertained to wetlands, coastal wildlife, refuges, and wilderness areas.

157.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)    Despite publicly providing worst case damage scenarios significantly higher than the amount of the actual spill that occurred after the *Deepwater Horizon* explosion, BP proved unable to respond.  As noted by the Presidential Commission, "[d]espite [BP's claims that it 'could recover nearly 500,000 barrels of oil per day'], the oil-spill removal organizations were quickly outmatched."  Likewise, as explained by a group of eight U.S. Senators in a May 17, 2010 letter to Attorney General Holder, there was no "proven equipment and technology" to respond to the spill.  The Senators wrote that "[m]uch of the response and implementation of spill control technologies appears to be taking place on an ad hoc basis."  Indeed, BP acknowledged on May 10, 2010, that: "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

(b)    BP falsely represented that the IEP was based on an analysis of the Mississippi Canyon Block 252 site when, in fact, the IEP was boilerplate language copied from one or more exploration plans that MMS had previously approved for other distinct drilling sites;

62

(c)     BP misrepresented that BP was prepared to stop a blowout at Mississippi Canyon Block 252 or contain the resulting oil spill when, in fact, BP was wholly unprepared; and

(d)     BP misrepresented that an oil spill would not adversely impact beaches, wetlands, and other environmentally sensitive areas.

158.    On June 30, 2009, BP publicly filed its revised Regional OSRP.  The response plan was issued by the Gulf of Mexico Strategic Performance Unit based in Houston, Texas. According to BP's Regional OSRP, the "TOTAL WORST CASE DISCHARGE" scenarios in the Gulf of Mexico ranged from a release of 28,033 bopd to 250,000 bopd.  More specifically, BP's Regional OSRP provided: (i) an oil spill occurring less than ten miles from the shoreline could create a worst case discharge of 28,033 bopd; (ii) an oil spill that occurred greater than ten miles from the shoreline could create a worst case discharge of 177,400 bopd; and (iii) an oil spill caused by a mobile drilling rig that is drilling an exploratory well could create a worst case discharge of 250,000 bopd.  BP's Regional OSRP represents that the Company and its subcontractors could recover approximately 491,721 bopd (or more than 20.6 million gallons) in the event of an oil spill in the Gulf of Mexico.  BP further claimed in the Regional OSRP that the Company and its subcontractors "maintain the necessary spill containment and recovery equipment to respond effectively to spills."

159.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, that BP and its subcontractors "maintain the necessary spill containment and recovery equipment to respond effectively to spills," were materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, because, among other reasons, BP's Regional OSRP contained numerous errors and gross deficiencies and was wholly inadequate to respond to a deepwater oil spill.

63

Despite publicly providing worst case damage scenarios significantly higher than the amount of the actual spill that occurred after the *Deepwater Horizon* explosion, BP proved unable to respond, and BP's "oil-spill removal organizations were quickly outmatched."  In fact, several U.S. senators commented – and Hayward and Suttles admitted – that BP did not have "proven equipment and technology" and was instead responding "on an ad hoc basis" and was "making it up day to day" despite BP's public pre-spill representations that it had "the capability to respond … to a worst-case discharge."

160.    With respect to the specific representations in BP's Regional OSRP, most of the content of the report was at best irrelevant and immaterial, having been copied from other websites, and at worst wholly inaccurate, "describe[ing] biological resources nonexistent in the Gulf" and identifying a "wildlife expert" who had died several years before the issuance of the Regional OSRP.

161.    On November 19, 2009, defendant Rainey testified before the United States Senate Committee on Energy and Natural Resources.  Rainey's testimony included the following false and misleading statements:

> Releases from oil and gas operations are rare, and the application of technology has enabled a dramatic reduction of releases from our industry over the last 30 years.  To be clear, any release from our operations is unacceptable, and we will continue to invest in research and technology to drive us to our ultimate goal of zero discharge.

162.    Rainey also submitted a written statement to the Senate committee which included the following false and misleading statements:

> Examples of the technologies which have helped to reduce accidental releases include:
>
> • Down hole flow control valves that shut down the well automatically if damage to the surface equipment is detected;

64

• Blowout preventer technology which includes redundant systems and controls;

• New and improved well control techniques which maintain constant control of the fluids in the wellbore;

• Sensors which continually monitor the subsurface and seabed conditions for sudden changes in well pressures; and

• BP's fiber optic network in the US Gulf of Mexico which allows us to monitor well pressures in real time, both at the facility and in our offices in Houston.

While our intent is to prevent all accidental discharges, we conduct regular emergency drills with local, state, and federal agencies.  All of our production facilities have contingency plans that identify the procedures, response equipment, and key personnel needed for responding to incidents.

Offshore Technologies Enabling Environmental Stewardship

Three key technologies which enable the safe and reliable production of offshore oil and gas resources:

Seismic imaging;

Offshore drilling; and

Offshore production systems.

Seismic imaging allows us to predict the presence of hydrocarbon reservoirs below the sea bed.  Drilling allows us to test for the presence of hydrocarbons in the reservoirs.  When hydrocarbons are present, the well bore connects the reservoir to the surface, where production systems enable us to produce the hydrocarbons, and deliver them safely to the refinery.

Our industry has a remarkable track record of moving forward the limits of each of these technologies.  In BP, we have been at the forefront of both the development of the technologies, and their application.

*       *       *

Advances in drilling technologies and production systems have been significant.  They include extended reach drilling, drilling in deeper waters, and to greater depths. These advances enable more production while reducing

65

environmental impacts and allowing for efficient use of existing facilities and infrastructure.

163.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, because, among other reasons, BP's Regional OSRP contained numerous errors and gross deficiencies and was wholly inadequate to respond to a deepwater oil spill.  Despite publicly providing worst case damage scenarios significantly higher than the amount of the actual spill that occurred after the *Deepwater Horizon* explosion, BP proved unable to respond, and BP's "oil-spill removal organizations were quickly outmatched."   In fact, several U.S. senators commented, and Hayward and Suttles conceded, that BP did not have "proven equipment and technology" and was instead responding "on an ad hoc basis" and was "making it up day to day" despite BP's public pre-spill representations that it had "the capability to respond … to a worst-case discharge."

164.    Moreover, despite reassuring the market just six months before the *Deepwater Horizon* disaster that BP had "[b]lowout preventer technology which includes redundant systems and controls," BP specifically asked that these redundant systems be removed from the *Deepwater Horizon* to speed up testing, including the removal of a second (and recommended) blind shear ram to counteract any issues with the BOP.

165.    On March 5, 2010, BP filed its 2009 Annual Report with the SEC on Form 20-F, which was signed by defendants Hayward and Grote.  BP's Form 20-F falsely stated, in part, that:

> Following the tragic incident at the Texas City refinery in 2005 the [Safety, Ethics, and Environment Assurance] committee has observed a number of key

> developments, including: the establishment of a safety & operations (S&O) function with the highest calibre of staff; development of a group-wide operating management system (OMS) which is being progressively adopted by all operating sites; the establishment of training programmes in conjunction with MIT that are teaching project management and operational excellence; the dissemination of standard engineering practices throughout the group; and the formation of a highly experienced S&O audit team formed to assess the safety and efficiency of operations and recommend improvements. Throughout this time the group chief executive has made safety the number one priority.

166.   The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading because Defendants knew or recklessly disregarded the fact that BP was expanding its deepwater drilling operations without implementing the recommendations by the Baker Panel to improve process safety or instituting sufficient operational protocols and safety standards necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk.  For example, BP failed to institute procedures to reduce the risk of accidents occurring at its rigs, including the *Deepwater Horizon*, despite being aware of the specific dangers tied to executing cement jobs in the course of deepwater drilling.   Moreover, the fact that the *Deepwater Horizon* disaster was strikingly similar to prior disasters at Texas City and Prudhoe Bay demonstrates that BP was not making progress in implementing the recommendations of the Baker Panel.   As the Presidential Commission found, BP lacked "consistent and reliable risk management processes."

167.   On March 22, 2010, defendant Inglis delivered a speech at the Howard Weil Energy Conference in New Orleans, Louisiana, in which he discussed deepwater operations in the Gulf of Mexico.  BP posted a transcript of the speech on its publicly-accessible website. During his speech, Inglis falsely stated, in part:

> Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a

single, consistent framework for our operations, covering all areas from personal
and process safety to environmental performance.  And I am pleased to say that in
2009 we saw continuing improvement in all aspects.

168.    The foregoing statements, which caused BP securities to trade at artificially
inflated prices, were false or misleading when made, and were known by Defendants to be false
at that time, or were made with reckless disregard for the truth, because, as revealed in the
Presidential Commission Report, BP's OMS did not provide a "single" or "consistent"
framework for BP's safety operations around the world.  Rather, it allowed BP to use
differing safety practices country-by-country and to satisfy minimal safety standards set by
local regulations.

169.    On March 23, 2010, defendant Hayward delivered a speech at the Peterson
Institute for International Economics in Washington, D.C., in which he discussed BP's changes
to its safety program following the Texas City, Texas refinery explosion.  BP posted a transcript
of the speech on its publicly-accessible website.  During the presentation, Hayward falsely
stated, in part, that:

Five years ago on this day, fifteen people died and many more were injured, when
an explosion tore through our Texas City refinery.

That tragic accident has changed in a profound and fundamental way our
approach to safety and operations integrity - providing a safe working
environment is a paramount responsibility, and our first and foremost
priority.

170.    The foregoing statements, which caused BP securities to trade at artificially
inflated prices, were materially false and misleading because Defendants knew or recklessly
disregarded the fact that BP was expanding its deepwater drilling operations without
implementing the recommendations by the Baker Panel to improve process safety or instituting
sufficient operational protocols and safety standards necessary to reduce the risk of catastrophic

failure, thereby increasing the Company's exposure to risk.  For example, BP failed to institute procedures to reduce the risk of accidents occurring at its rigs, including the *Deepwater Horizon*, despite being aware of the specific dangers tied to executing cement jobs in the course of deepwater drilling.  Moreover, the fact that the *Deepwater Horizon* disaster was strikingly similar to prior disasters at Texas City and Prudhoe Bay demonstrates that BP was not making progress in implementing the recommendations of the Baker Panel.  As the Presidential Commission found, BP lacked "consistent and reliable risk management processes."

171.    As discussed above, on the evening of April 20, 2010, after the markets closed, the Macondo well suffered a significant – yet preventable – blowout, leading to a fatal explosion aboard the *Deepwater Horizon*, killing 11 crew members and injuring many others.  After attempts to stop the blowout failed, the surviving crew members abandoned ship as the rig became engulfed in flames.  Consequently, oil and gas spewed from the Macondo well onto the rig and into the Gulf of Mexico.

172.    Thereafter, on April 28, 2010, after the markets closed, Coast Guard leader Rear Admiral Landry announced during a joint press conference with BP that NOAA had increased its estimate of the oil flow rate from 1,000 to 5,000 bopd.

173.    During the joint press conference, defendant Suttles again reiterated that BP's best estimate was that 1,000 barrels of oil per day were flowing from the Macondo well.  In addition, Suttles stated, in part, as follows:

> Late this afternoon, while monitoring the blowout preventer area, which we have done continuously since the event began, we discovered a new point of leak.  This leak is just beyond the top of the blowout preventer in the pipe work called the riser.  Given the location, we do not believe this changes the amount currently estimated to be released.

174.    The following day, April 29, 2010, Department of Homeland Security chief

Janet Napolitano announced that "today I will be designating that this is a spill of national significance."

175.    On the same day, April 29, 2010, defendant Suttles conducted several media interviews to discuss the oil flow rate from the Macondo well.  For example, during an interview with *The Early Show*, Suttles stated, in part, as follows: "I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today." Suttles made nearly identical false statements that same day during interviews with *The Today Show* and *Good Morning America*.

176.    Defendant Suttles continued to make false and misleading statements concerning the amount of oil escaping from the Macondo well throughout the month of May.  For instance, during a May 14, 2010 interview on *Good Morning America*, Suttles claimed that, "ourselves and people from NOAA and others believe that something around 5,000, that's actually barrels a day, is the best estimate."  On the same day, Suttles told *The Today Show* that "I don't think it's wildly different than that [5,000 bopd] number, but it could be – we've said since the beginning it could be a bit above or below."  Then, at a Unified Command press briefing on May 17, 2010, Suttles reiterated that the 5,000-bopd estimate was "our best estimate today."  Suttles used nearly identical language in an interview with *Good Morning America* on May 21, 2010, and at a Unified Command press conference that same day.  Finally, during an interview with National Public Radio's *Weekend Edition*, Suttles balked at the estimate, suggested by independent scientists, of a flow rate of 70,000 bopd:

> I've heard those [70,000 bopd] estimates and seen them and I don't believe
> it's possible that it's anywhere near that number . . . since I can't meter it, I
> can't actually say it couldn't be.  But all of our techniques would say that

that's highly unlikely.

When, during the same interview, it was suggested that the well might be leaking at a rate of 30,000 bopd, Suttles said that "we don't think the rate's anywhere near that high."

177.   Similarly, on May 5, 2010, defendant Hayward conducted an interview with journalists from the Houston Chronicle at BP's offices in Houston.  In reference to the oil flow rate at the Macondo well, Hayward stated, "[a] guesstimate is a guesstimate.  And the guesstimate remains 5,000 barrels a day."

178.   The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading because Defendants knew or recklessly disregarded that the Company's "best estimate" of the amount of oil spewing from the well on a daily basis was more likely 5,758 bopd, with a high of 14,266 bopd.  BP senior management, including Suttles, received this "best estimate" range by way of two internal reports dated April 26, 2010, and April 27, 2010, i.e., before Suttles told the market that the oil flow was 1,000 bopd on April 28, 2010, and between 1,000 and 5,000 bopd on April 29, 2010.

179.   On May 6, 2010, defendant Dudley delivered a speech at the Chief Executives' Club in Boston, Massachusetts.  BP posted a transcript of the speech on its publicly-accessible website.  In the speech, Dudley discussed the *Deepwater Horizon* rig and its safety mechanisms.  More specifically, Dudley falsely stated, in part, that:

> At the time of the explosion, the *Deepwater Horizon* drilling rig had been working for BP for almost nine years .... The rig had handled some of the industry's greatest technical challenges, and her safety record had been excellent and had recently won awards.
>
> *         *         *
>
> A Blowout Preventer is used on every oil and gas well drilled in the world today - onshore and offshore.

71

These mechanisms are regularly inspected and tested. If they don't pass the test, drilling operations are made safe and the system is replaced or repaired and retested.

BOPs are designed to be fail-safe. This Blowout Preventer was not. It failed to close, or to close completely.

180.     The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading because Dudley falsely represented that the *Deepwater Horizon*'s safety record had been excellent when, in fact, there were problems with the rig as far back as 2005.  In fact, four to six weeks before the explosion, a leak developed in the *Deepwater Horizon*'s BOP that was reported to both BP and the owner of the rig; instead of effectuating repairs, the faulty part responsible for the leak was switched off.  Moreover, four weeks prior to the explosion, chunks of the BOP's rubberized annular preventer had surfaced after a pressure-related incident, further indicating that there were operational problems with the BOP, yet nothing was done.  Instead, on March 6, 2010, BP sought and obtained a postponement of MMS' inspection of the BOP.  This was directly contrary to Dudley's representation that the BOPs were "replaced or repaired and retested" when proven faulty.  Moreover, Dudley failed to disclose that BP contracted to remove a second blind shear ram, putting the BOP at a higher risk for malfunction and increasing the "risk profile" of the BOP.

181.     On May 10, 2010, McKay appeared before the Congressional Committee on Transportation and Infrastructure and said the following in response to a question about whether "5,000 barrels per day [was] the most accurate" figure for the amount of oil leaking into the Gulf:

**[McKay]**: That is our best estimate.  Obviously, it's continually being looked

72

at.  As you may know, we've gotten this riser insertion tube to work, and we're getting increased volumes at the surface where we can actually measure.  And then, I believe there is a new small task force that has been put together under the direction of Unified Command to get all the experts together in a room and try to understand, with the latest available data, is there a more accurate estimate?  But we do recognize there is a range of uncertainty around the current estimate."

182.    The following exchange followed later during the same hearing:

**[Rep. Laura A. Richardson]**: … Why is there a disagreement between the total amount of oil that is leaking?  BP has said 5,000, other experts are saying otherwise.  Why do you think there is a disagreement, and do you stand by your point that it is only 5,000?

**Mr. McKay**.  I think there are a range of estimates and it is impossible to measure.  That is the reality.  What we have been doing with government officials, government experts, industry experts, is trying to come up with the best estimate, and that has been done essentially by understanding what is happening at the surface and trying to understand volume there, adding to it what we believe the oil properties, how it would disperse in a water column as it moves to the surface.  And those two added together is the estimated volume.  It has been clear from day one there is a large uncertainty range around that.

**Ms. Richardson**.  Is it possible it could possibly be the larger number that has been reported?

**Mr. McKay**.  It is theoretically possible.  I don't think anyone believes it is quite that high that has been working on this.  I believe the uncertainty range is around that 5,000 number, and it could be higher.  But if the number you are talking about is 70,000 barrels a day, I don't know this, but I don't think people that are working with it believe that that is a possibility.

183.    On May 18, 2010, Hayward reiterated to the press in statements made in Houston that "I think the environmental impact of this disaster is likely to be very, very modest.  It is impossible to say and we will mount, as part of the aftermath, a very detailed environmental assessment as we go forward....  By everything we can see at the moment suggests that the overall environmental impact of this will be very, very modest."

184.    The foregoing statements, which caused BP securities to trade at artificially

73

inflated prices, were materially false and misleading because Defendants knew or recklessly disregarded that the Company's "best estimate" of the amount of oil spewing from the well on a daily basis was more likely 5,758 bopd, with a high of 14,266 bopd.  BP senior management, including Suttles, received this "best estimate" range by way of two internal reports dated April 26, 2010, and April 27, 2010, *i.e.*, before McKay and Hawyard explained that BP's best estimate was a flow rate of approximately 5,000 bopd and that the overall environmental impact of the *Deepwater Horizon* disaster would be modest.  In actuality, the amount of oil spilling into the Gulf of Mexico was approximately 60,000 bopd – which is significantly closer to the 70,000 bopd McKay dismissed as something people working on the spill response would not believe.

185.    In a hearing before the U.S. House of Representatives on May 26, 2010, Representative Edward Markey was outraged about Suttles' misrepresentations and stated, in part, as follows:

> Yesterday, BP provided me with an internal document dated April 27, 2010, and cited as BP Confidential that shows a low estimate, a best, and a high estimate of the amount of oil that was leaking.  According to this BP document, the company's low estimate of the leak on April 27 [2010] was 1,063 barrels per day. Its best guess was 5,758 barrels per day. Its high estimate was 14,266 barrels per day.

> \*       \*       \*

> BP has also turned over another document dated April 26[, 2010] which includes a 5,000 barrel per day figure as well.  So when BP was citing the 1,000-barrel per day figure to the American people on April 28th, their own internal documents from the day before show that their best guess was a leak of 5,768 barrels per day and their high estimate was more than 14,000 barrels that were spilling into the Gulf every day.

186.    Likewise, in a May 27, 2010 news conference, President Obama remarked that BP had failed to be fully forthcoming in describing the rate of the oil leak:

I think it is a legitimate concern to question whether BP's interests in being fully forthcoming about the extent of the damage is aligned with the public interest.  I mean, their interests may be to minimize the damage, and to the extent that they have better information than anybody else, to not be fully forthcoming.  So my attitude is we have to verify whatever it is they say about the damage.

This is an area, by the way, where I do think our efforts fell short.  And I'm not contradicting my prior point that people were working as hard as they could and doing the best that they could on this front.  But I do believe that when the initial estimates came that there were -- it was 5,000 barrels spilling into the ocean per day, that was based on satellite imagery and satellite data that would give a rough calculation.  At that point, BP already had a camera down there, but wasn't fully forthcoming in terms of what did those pictures look like.

187.    Also, in his book on the *Deepwater Horizon* incident, former drilling engineer Bob Cavnar explained that "[n]o one in the industry ever believed the flow were less than 20,000 barrels a day."   In an interview, Cavnar said that the characteristics of the Macondo well, particularly that it was drilled into "High Pressure High Temperature" pay sands and the specific fact that the well's pressure had blown out the *Deepwater Horizon*'s riser dictated a higher flow rate.   "If pressure directly from the pay sands blows out a major deepwater rig, by definition it's going to result in a very significant flow of oil," he said.

188.    The official flow rate estimates released by the Flow Rate Technical Group ("FRTG"), a group of scientists and engineers from federal agencies and universities charged with estimating the oil flow from the *Deepwater Horizon* disaster, confirmed the severe inadequacy of the flow rates provided by BP and the Individual Defendants.  Following its creation in May 2010, the FRTG produced four public reports, the first of which estimated the flow rate at 11,000 to 25,000 bopd.  Each subsequent estimate eclipsed its predecessor and, on August 2, 2010, the FRTG publicly released its final report, which estimated that the Macondo well had leaked oil at a rate of 52,700 to 62,200 bopd during the course of the leak, resulting in the release of roughly 4.9 million barrels of oil.

75

189.    On Saturday, May 29, 2010, BP revealed that the top kill procedure it had begun a few days earlier had failed.  The failure of top kill indicated that BP would be unable to stop the oil spill and would have to rely on efforts to try to contain the spill while it completed the relief wells. The failed attempt to kill the well by using the top kill and junk shot efforts shocked investors.  As noted by ABC News on Saturday, May 29, 2010: "We begin tonight with breaking news from the Gulf.  After so much talk that Top Kill was the best bet to plug the oil spill in the Gulf, BP announced just a short time ago that the effort has failed....  That live picture so many Americans have been keeping track of [*i.e.*, the oil spewing from the Macondo well], us included, confirms that the oil is still gushing into the Gulf.  This is another crushing blow when it comes on what is now day 40 of this crisis."  Similarly, on that same day, the Agence France Pressé reported, in part, that: "The announcement [that the top kill and junk shot plans failed] is a stunning setback for efforts to halt what has become the worst oil spill in US history [...]."  Moreover, *The Business Insider* made clear that the failure of the top kill would lead to BP's securities being "slaughtered in London trading on Monday."

190.    On that same day, *The New York Times* published an article entitled "Documents Show Early Worries About Safety of Rig."  The article provided new evidence that:

> Internal documents from BP show that there were serious problems and safety concerns with the *Deepwater Horizon* rig far earlier than those the company described to Congress last week.
>
> *      *      *
>
> The documents show that in March, after several weeks of problems on the rig, BP was struggling with a loss of "well control."  And as far back as 11 months ago, it was concerned about the well casing and the blowout preventer.

191.    On Tuesday, June 1, 2010, minutes before the close of the U.S. market, U.S. Attorney General Eric Holder announced that the Department of Justice had opened formal

criminal and civil probes into BP in response to the oil spill and its false assurances that it could

stop the flow of oil.  On this news, BP ordinary shares declined approximately 13%, from £4.94

per share, to close at £4.30 per share on June 1, 2010.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

### A.   Defendants Knew, or Recklessly Disregarded, That BP's Process Safety Procedures Did Not Adequately Address the Known Risks in Deepwater Drilling, Risks that Materialized at the Macondo Well

192.    Throughout the Relevant Period, Defendants were aware, or recklessly

disregarded, that their statements to investors regarding BP's commitment to safety were not

true and that their statements touting the importance of deepwater drilling in the Gulf of

Mexico omitted material information regarding BP's highly risky and unsafe practices in its

deep sea operations.

193.    In a June 19, 2010 article, *The New York Times* reported that in mid-2006, in

the wake of Prudhoe Bay and Texas City, then-CEO John Browne asserted that "[w]e have

to get the priorities right.…  And Job 1 is to get to these things that have happened, get them

fixed and get them sorted out.  We don't just sort them out on the surface, we get them fixed

deeply."  Hayward picked up this mantle after he succeeded Browne in May 2007 by boldly

vowing to focus "like a laser" on safety.  To this end, Hayward and BP consistently assured

investors that the Company was committed to strengthen process safety within BP's

operations, including the key operations in the Gulf of Mexico.

194.    Regrettably, BP's assurances were nothing more than bluster belied by the

refinery violations BP accumulated between 2005 and 2010 and the Company's continued

choice of savings over safety.  For example, in May 2010, immediately after the *Deepwater

Horizon* disaster, it was revealed by the Center for Public Integrity that between June 2007 and

77

February 2010, BP received a total of 862 citations for OSHA violations relating to its refineries in Texas City and Toledo, Ohio, of which 760 were classified as "egregious willful" and 69 were classified as "willful."  The willful violations accounted for over 97% of all willful violations found by OSHA in all U.S. refineries during the same period – BP's main competitors' combined citations were 22.  Likewise, the UK's Health and Safety Executive imposed substantial fines and citations on BP – issuing no fewer than 100 letters or notices to the Company between 2006 and 2010 – for safety or environmental violations related to exploration or production rigs, pipeline or storage systems, or other facilities.

195.    In 2006, BP commenced its OMS, touting it as a "single framework" of standards across BP's operations, which would result in "continuous improvement" of safety practices.  In April 2008, defendant Hayward acknowledged that OMS was directed at "ensuring that our operations across the world look and feel the same everywhere – and perform to the same high standard."

196.    Despite BP's proclamations of a standardized safety strategy, as revealed in testimony in 2010 and the Presidential Commission Report, BP's OMS did not provide a "single" or "common" framework for BP's safety operations around the world.  Rather, it allowed BP to use differing safety practices country-by-country and to satisfy minimal safety standards set by local regulations.

197.    BP's willingness to exploit less restrictive local rules was clearly on display in its Gulf of Mexico operations.  With respect to offshore drilling operations, applicable rules for drilling protocols are more rigorous in certain jurisdictions, such as Norway, Canada, and the UK, than in the Gulf of Mexico.  For example, rules exist in other jurisdictions that require that two barriers must always be maintained on top of hydrocarbons during well

completion, that wells in temporary abandonment never be left "underbalanced," and that BOPs always be equipped with two blind shear rams and emergency acoustical switches. BP followed such higher standards for wells drilled in jurisdictions that required these heightened safety measures, but took advantage of a lower level of regulation in the Gulf of Mexico.

198.   In this way, BP's OMS operates in marked contrast to Shell's safety program. Shell's "Safety Case" methodology dictates that Shell personnel not merely follow regulations, but specifically make out a satisfactory "case" for the safety of a particular operation and the mitigation of risk.  Shell's Safety Case further requires that the company perform the same mandatory drilling practices around the world, whether required by regulation or not.  In direct contrast to Shell's program, BP's OMS failed to set consistent safety standards across BP's operations despite representations by Defendants to investors that BP adopted consistent practices throughout its global operations.

**B.     BP Cuts Corners and Ignores Safety Risks on the *Deepwater Horizon* Rig to Speed the Sealing of the Macondo Well**

199.   BP's exploration operations at the Macondo well included the *Deepwater Horizon* drilling platform leased from Transocean and Halliburton personnel conducting subcontracting tasks.  Despite this, the supervision of the entire exploration operation was BP's responsibility, as certified in its IEP.

200.   Although the exploration drilling phase of the Macondo well was successfully completed in early 2010, it was shockingly over-budget.  For example, this initial phase was supposed to last only three weeks, but took six weeks, resulting in additional costs of over $25 million to BP.  Moreover, the temporary abandonment of the Macondo well was 45 days

79

late and $58 million over budget.  These costly delays led BP down one path – to cut corners on safety to hasten the sealing of the well and the eventual oil extraction.  This rashness only heightened the safety risks already inherent in the drilling operations at this particular site, including the likelihood of a BOP failure.

201.   As early as 2001, and on a continuous basis throughout the Relevant Period, Defendants knew that various components of BOPs in use (both on their own rigs and Transocean-owned rigs) had high probabilities of failure, especially in deepwater and ultra-deepwater settings, where drill piping is thicker and more difficult to cut and where hydrostatic pressures affect hydraulic systems that control the BOP rams.

202.   In July 2001, the analyst group SINTEF, the largest independent research organization in Scandinavia, provided the MMS with a report recommending that all deepwater and ultra-deepwater drilling rigs in operation in the Gulf of Mexico be equipped with not one, but two separate blind shear rams, because of the significant risk that one might fail.  The SINTEF report, while not publicly released, was shared with BP and other industry operators.

203.   BP exacerbated the risk of BOP failure by permitting rigs operating in the Gulf of Mexico to be equipped with just one single blind shear ram.  Notably, in late 2004, before the start of the Relevant Period, BP contracted with Transocean to replace one of the rams on the *Deepwater Horizon*'s BOP with a test ram in order to speed up testing procedures.  Yet, the installation of this test ram lowered the unit's reliability even further.  Indeed, an agreement between BP and Transocean executed in October 2004 noted BP's awareness that the removal of the second ram would "reduce the built-in redundancy" of the BOP and raise the rig's "risk profile."  The existence of this agreement was not made public until June 20, 2010.

204.   The inherent risk and lack of redundancy for the *Deepwater Horizon*'s BOP

80

should have been all the more apparent to BP when it was informed, prior to the explosion, that chunks of the BOP's annular preventer had broken off, causing a leak in the hydraulic system controlling device – pointing to severe operational problems with the BOP.  In fact, Remotely Operated Vehicle technician Tyrone Benton testified before the Joint Investigation Team of the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE") (formerly MMS) and the United States Coast Guard ("Joint Investigation Team") on July 23, 2010, that he discovered a leak in the *Deepwater Horizon*'s BOP sometime between "February 24 and March 13[, 2010]."  On June 21, 2010, *The Guardian* reported that Benton advised representatives of BP and Transocean of this critical issue, but no repairs were made: "Benton says that he spotted a leak on the rig's Blowout Preventer.…  He told the BBC's Panorama programme that both BP and Transocean, who owned the rig, were informed of the leak, and the faulty part – a control pod – was switched off rather than being repaired."  In fact, a July 20, 2010 *Los Angeles Times* article corroborated Benton's statement, reporting that testimony revealed that "as early as February [2010], a routine monthly maintenance report showed fluids leaking from the blowout preventer.  A subsequent report in March [2010] showed the problem had not been fixed."

205.    Likewise, Ronald Sepulvado, one of BP's two top officials aboard the *Deepwater Horizon*, testified before the Joint Investigation Team that "[o]ne of the [BOP] functions was leaking hydraulic fluid – the fluid used in the system to operate it."  Sepulvado stated that he "reported it to John Guide [in Houston], who was the [BP] team leader at the time.  I don't know if he reported it to MMS or not."  Although he acknowledged that federal guidelines require drilling to be suspended if the BOP is not fully functional, Sepulvado was falsely assured that "everything was O.K., since I reported it to the team leader and he should've reported it to MMS."  BP, however, not only failed to report this information to the MMS as required, but

continued to keep drilling.

206.    The Joint Investigation Team also concluded that the *Deepwater Horizon* was not in compliance with another federal regulation requiring independent inspection of a rig's BOP every three to five years.  During the hearing, Jason Matthews, an official with the Interior Department, recited the results of an audit of the *Deepwater Horizon* conducted April 4-14, 2010, revealing that the BOP "was well past its … inspection dates of every three to five years." According to *The Times-Picayune*, investigators stated that they had no record of an inspection after the year 2000 – approximately ten years before the explosion.  Despite his senior leadership on the rig, Sepulvado testified that he was not familiar with the inspection requirement.

207.    In addition, during the process to seal the well, BP officials on the *Deepwater Horizon* made critical decisions that were clearly designed to hasten the process and save money despite the risk of a major disaster.  In fact, the Presidential Commission found that there was no "comprehensive and systematic risk-analysis, peer-review, or management of change process" for any of the following key decisions, amongst others:

- Failing to wait for the correct amount of centralizers;

- Failing to wait for the foam stability test results and/or redesigning slurry;

- Failing to run a cement evaluation log;

- Failing to use the correct spacer to avoid disposal issues;

- Failing to displace the mud from the riser before setting the surface cement plug;

- Failing to properly place the cement plug at the appropriate level and instead placing it 3,000 feet below the mud line;

- Failing to install additional physical barriers during the temporary abandonment procedure;

- Failing to perform further well integrity diagnostics in light of the troubling and

unexplained negative pressure test failures; and

•    Failing to use the correct mud pits and conducting other simultaneous operations during mud displacement.

The Presidential Commission then concluded that "[t]he evidence now available does not show that the BP team members (or other companies' personnel) responsible for these decisions conducted any sort of formal analysis to assess the relative riskiness of available alternatives."

208.   In the aftermath of the Macondo spill, Hayward effectively admitted that the successful implementation of process safety improvements during the Relevant Period had failed.  On May 3, 2010, Hayward acknowledged that BP was fully responsible for the spill and stated that "[i]t is indeed BP's responsibility to deal with this, and we are dealing with it.…  We will absolutely be paying for the cleanup operation.  There is no doubt about that.  It's our responsibility – we accept it fully."

209.   Similarly, in a June 2, 2010 article entitled "BP 'not prepared' for deep-water spill," the *Financial Times* reported that defendant Hayward "accepted it was 'an entirely fair criticism' to say the company had not been fully prepared for a deep-water oil leak" and acknowledged that it "is undoubtedly true that we did not have the tools you would want in your tool-kit."

210.   Then, in a November 9, 2010 interview with BBC, defendant Hayward confessed that BP had failed to develop adequate emergency response plans for oil spills and admitted that BP was "making it up day to day."

C.    **BP's Conduct Did Not Conform to Industry Standard**

211.   BP's sealing of the Macondo well was a clear breach of the established standard of care.  As noted in the preliminary findings of the "Deepwater Horizon Study Group" issued on

83

July 15, 2010 by the Center for Catastrophic Risk Management at the University of California,

Berkeley:

> To date compelling indicators have been surfaced to suggest that: 1) BP's drilling
> and well completion operations did not meet industry standards, 2) operations
> were "Faster" and "Cheaper," but not "Better" – the operation records point to
> excessive economic and schedule pressures resulting in compromises in the
> Quality and Reliability of the Macondo deep water oil and gas development
> system, and, thus ignoring risks and potential consequences, 3) the involved
> parties did not anticipate a blowout and, accordingly, did not develop effective,
> collaborative and constructive interactions to ensure that the resources needed in
> case of a blowout would be available.

212.    These findings were substantiated by others in the industry.  For example, on June

15, 2010, Rex Tillerson, the CEO of ExxonMobil, testified before the Congressional

Subcommittee on Energy and Environment of the House Committee on Energy and Commerce.

Tillerson commented that the BP incident "represents a dramatic departure from the industry

norm in deep water drilling."  Tillerson emphasized that his company "would not have drilled the

well the way [BP] did" (noting, in particular, the well design, cement mixture and testing

procedures) and asserted that ExxonMobil's focus on "safe operations and risk management"

would have prevented the oil spill.  He added that the Macondo well had "a lot of indications or

problems … going on for some period of time leading up to the final loss of control."  Senior

executives of other companies in the field leveled similar criticisms.  For instance, John Watson

(Chairman of Chevron) acknowledged "[i]t certainly appears that not all the standards that we

recommend or that we would employ were in place."  Likewise, Marvin Odum (President of

Shell) stated that "[i]t's not a well that we would have drilled in that mechanical setup."

213.    The Presidential Commission also reached the identical conclusion – BP had no

"comprehensive and systemic risk-analysis, peer-review, or management of change process" for

a series of key decisions and the evidence did not show that "BP team members … responsible

84

for these decisions conducted any sort of formal analysis to assess the relative riskiness of available alternatives." In connection with BP's Regional OSRP, the Presidential Commission described it as outright "embarrassing," as it "described biological resources nonexistent in the Gulf – including sea lions, sea otters, and walruses."

### D.   BP Knowingly or Recklessly Disregarded That its 2007-2009 Budget Reductions and Staff Reorganizations Were Negatively Affecting Its Operational Process Safety Programs

214.   Contrary to public statements and assurances to shareholders, BP's cost-cutting affected protocols and processes for ensuring worker and process safety and preventing environmental incidents.

215.   In October 2007, defendant Hayward announced plans to reorganize BP to accomplish "increased efficiencies." Defendant Grote, BP's CFO, told analysts in an October 2007 conference call that the changes were "designed to simplify the organization and improve productivity and accountability, bringing up operating units to enable them to focus on safe, reliable, and profitable operations." However, Defendants failed to disclose that the so-called "reorganization" – which resulted in numerous layoffs and cuts to safety budgets – would materially affect the Company's ability to drill safely in the Gulf of Mexico.

216.   Cutbacks and layoffs climaxed in 2009. For example, the Class Action Complaint asserts that the manager of report writing in the Office of Compliance and Ethics ("OCE") at BP America during 2008 and 2009 (referenced as Confidential Witness No. 1 ("CW1")) stated that in July 2009, BP merged its U.S.-based Group Compliance and Ethics ("GRCE") Office in Houston, which oversaw BP operations in the Americas, with its Global Compliance and Ethics ("GLCE") Office in London. According to CW1, the merger resulted in "huge staff reductions" with GRCE suffering a 33% cut and GLCE cut by 44%. (As a result of the merger, CW1 was

offered a severance package and resigned.)  Even with these deep cuts, Defendants continued to falsely profess throughout the Class Period that the Company's focus on process safety would not be hampered.

217.    The cuts and reshuffling in BP's Compliance and Ethics staff was reflected also in cuts in Health, Safety, Security, and Environment ("HSSE") staff that led to resignations and terminations of HSSE managers who complained or raised issues about the cuts.  Among those terminated was Curtis Jackson, a senior HSSE manager for Gulf of Mexico operations, responsible for HSSE issues related to deepwater drilling, in January 2010.  Additionally, Phil Dziubinski, BP Exploration Alaska's senior officer for HSSE, who raised safety concerns stemming from extensive overtime in Alaska, was terminated in late 2009, ostensibly as part of HSSE downsizing.

218.    The effects of BP de-prioritizing safety in 2009 and re-shuffling and merging staff had direct repercussions on BP's drilling operations.  For instance, in late 2009, just before the *Deepwater Horizon* was dispatched to drill the Macondo well, BP's senior Vice President for Drilling Operations for the Gulf of Mexico, Kevin Lacy, resigned from the Company because of disagreements with BP over its lack of commitment to process safety.  Lacy, an experienced drilling engineer who had implemented a rigorous drilling safety program while at Chevron, had been recruited to join BP in 2007 to improve and standardize its drilling policies and protocols. Before leaving, Lacy communicated his concerns to executives with the Company, including to Barbara Yilmaz, BP's Vice President for Global Drilling and Completions, and to defendant Inglis, the head of BP's Exploration and Production unit.

219.    Lacy's departure from the Gulf of Mexico drilling unit in December 2009 coincided with other additional and extensive reorganizing of personnel in the BP Gulf of

Mexico drilling unit.  Several experienced senior engineers were transferred out of the Gulf of Mexico in or around December 2009, such that by the time of the *Deepwater Horizon* incident, four out of five of BP's senior drilling officials for the Gulf of Mexico had only been in their posts for a few months.  Indeed, BP's Wells Manager for the Gulf of Mexico, David Rich, was promoted only weeks before the incident and was primarily experienced in well completion operations, not exploratory drilling like that being undertaken by the *Deepwater Horizon* on the Macondo well.  Additionally, neither Rich nor his immediate subordinate, David Sims, the Drilling and Completions Operations Manager for the Gulf of Mexico, had experience with well control operations.

220.    Concerns about staffing turnovers were raised as a process safety issue in the Baker Report three and a half years earlier.  The staffing turnovers in the Gulf of Mexico directly impacted drilling operations on the *Deepwater Horizon*'s operations at the Macondo well.  Indeed, as *The Wall Street Journal* reported on January 29, 2011, John Guide, who directed *Deepwater Horizon*'s operations from Houston, told Sims just days before the *Deepwater Horizon* incident that it was "chaos" on the rig and that "[t]he operation is not going to succeed if we continue in this manner."  Sims merely told Guide to tell the rig workers "to hang in there ... until the [Macondo] well is over."  At that point, Sims left BP's Houston office to attend a dance practice.

E.    **Defendants' Estimates of the Gulf Oil Spill are Flatly Contradicted by Contemporaneous Internal Company Documents**

221.    Throughout the Relevant Period, defendants Hayward, Suttles, Rainey, and McKay were aware or recklessly disregarded that their statements concerning estimates of the amount of oil spilling into the Gulf following the *Deepwater Horizon* explosion were not true

and that their statements omitted material information regarding the true scope of the oil surging into the Gulf of Mexico.

222.    For example, an internal BP document (dated April 26, 2010) revealed that 5,000 barrels per day were leaking into the Gulf.  The document (released by Representative Ed Markey and linked to *The New York Times* article titled "Ruptured BP Well Tops Valdez as Worst U.S. Spill") flatly contradicted the 1,000 barrels a day BP initially claimed:

> Assuming that 50% of the plume volume is oil and a rise velocity of 15 cm/sec, the oil released from this source would be roughly 5000 bbl/day.  (approximately 200,000 gal/day) other sources would contribute additional oil.  This answer will be refined as additional information becomes available.  (marginalia omitted).

223.    Another internal BP document (dated April 27, 2010) that was provided to BP's senior management, linked to the same *The New York Times* article, revealed that the Company's low estimate of the oil spill was 1,063 bopd, its best estimate was 5,758 bopd and its high estimate was 14,266 bopd.

224.    As BP's COO for Exploration and Production and BP's officer in charge of co-managing the spill response with the U.S. Coast Guard, defendant Suttles knew the Company's estimated spill rate from the Macondo well, or was reckless in not knowing it.  Nevertheless, on April 28, 2010, as was reported by the *Huffington Post*, defendant Suttles reiterated earlier estimates that 1,000 barrels of oil from the Macondo well were spilling into the Gulf of Mexico each day.  Notably, on the same day, BP learned that the well's riser pipe had developed a new leakage point at the "kink" where the pipe had bent before it came to rest on the sea floor.  And when the NOAA representative within the Unified Command reported to senior members of the Command that NOAA's initial 1,000 bopd estimate was probably incorrect, defendant Suttles, after contacting a BP employee or agent, reported that BP's internal flow rate estimate was

between 1,000 and 5,000 bopd, with 2,500 bopd being the most likely rate.  Then, on April 29, 2010, defendant Suttles stated in an interview on CBS's *The Early Show* that "I think that somewhere between 1,000 and 5,000 barrels a day is probably the best estimate we have today" of the spill rate of the Macondo well.

225.   Likewise, defendant Hayward, as BP's CEO, knew the Company's April 26, 2010 and April 27, 2010 internal estimates of the Macondo well spill rate, or would have been reckless in not knowing about BP's internal reports.  Despite this, defendant Hayward ignored the Company's internal estimates and, in a May 5, 2010 *Houston Chronicle* interview, referred to the Macondo well spill rate by stating that "[a] guesstimate is a guesstimate.  And the guesstimate remains 5,000 barrels a day."

226.   Defendant Rainey, who was assigned to the Unified Command, knew or should have known BP's internal flow rate estimates.  On April 26, 2010, a NOAA senior scientist authored a memorandum – which was distributed to Unified Command personnel, including Rainey – which estimated the flow rate to be 5,000 bopd.  BP relied on this figure publicly.  At the same time, Rainey – who had no prior experience calculating oil spill flow rates – took it upon himself to create a BP flow rate estimate, and he prepared several spreadsheets indicating a "best guess" of 5,000 to 6,000 bopd.  Rainey's calculations were, incredibly, based on guidance he received by consulting the online encyclopedia "Wikipedia" and, later, more established sources.  Ultimately, however, Rainey's methodology was riddled with mathematical and procedural flaws, and the calculations were manipulated to consistently yield a "best guess" flow rate that approximated the April 26 NOAA estimate of 5,000 bopd.  Even using this flawed methodology, however, Rainey's calculations indicated that the flow could reach a rate of approximately 14,000 bopd.

89

227.    Additionally, as reported by the *Times-Picayune* on May 19, 2010, "[a]n engineering professor who has been monitoring the *Deepwater Horizon* disaster said … that 'there is scientifically no chance' that BP's estimate of a discharge of about 5,000 barrels of oil per day into the Gulf of Mexico is anything close to the actual number.  Steve Wereley, associate professor of mechanical engineering at Purdue University, told the House Energy and Environmental Subcommittee that his own review indicates that a 1.2-inch hole is producing about 25,000 barrels of oil a day by itself, and overall the daily spill could amount to something 'short of 70,000 barrels to as high as 115,000 barrels.'"

228.    In response to Wereley's estimates, "BP America Chief Executive Lamar McKay, denied that his company is trying to obscure the size of the leak.  'This leak is not measurable through technology we know,' he said.  He also told the House Transportation and Infrastructure Committee that anyone working on the spill would have a hard time believing the size is anything close to the 70,000 barrels per day projected last week by Wereley."

229.    However, approximately 60,000 barrels of oil per day were leaking into the Gulf of Mexico after the *Deepwater Horizon* sank.  Together with the internal BP estimates provided to the Defendants and Wereley's estimates (based on public information equally accessible to BP), Defendants knew, or were reckless in not knowing, that their statements minimizing the Macondo well spill rate were materially misleading.  Indeed, Defendants ignored, among other things, contemporaneous reports provided to them belying their public statements.  These included at least eleven items of data, estimates, and calculations showing flow rates significantly higher than 5,000 bopd, including:

- An April 30, 2010 analysis by a BP engineer showing a range of possible flow rates from 5,000 to 40,000 bopd;

90

- A video analysis, created in early May 2010 by a BP engineer, that resulted in a 20,000 bopd estimate for oil leaking from the riser pipe alone;

- A May 9, 2010 model, created by a BP contractor, that led to a possible range of 37,000 to 87,000 bopd;

- A May 10, 2010 video analysis, performed by a BP contractor, leading to the conclusion that, with respect to oil leaking from the riser alone, it could not be "ruled out" that the flow rate was "in the order of 40,000 bopd";

- A reservoir model, created by a BP engineer on or about May 10 and 11, 2010, yielding a range of potential flow rate estimates between 14,000 and 96,000 bopd;

- A critique of Wereley's estimates, authored by a BP engineer between May 14 and 15, 2010, explaining that Wereley potentially made errors that, when corrected for, yielded a revised estimate of 15,000 bopd flowing from the riser alone, from which the BP engineer deduced that a further reduction would be appropriate;

- A May 16, 2010 reservoir-depletion/pressure-drop analysis performed by a BP engineer, yielding a flow rate calculation of 86,000 bopd, based on then-estimated pressure;

- Data obtained from May 19 to 20, 2010, showing that oil collected from the riser pipe by the Riser Insertion Tube Tool ("RITT") was obtained at a rate of 5,000 bopd over a 12-hour period, indicating an overall flow rate greater than 5,000 bopd;

- A May 22, 2010 external surface expression analysis showing a range of estimated flow rates between 6,154 and 11,609 bopd;

- A May 23, 2010 analysis, conducted by a BP engineer, demonstrating that the oil flow emanating from the "kink" in the riser pipe alone was an estimated 11,600 bopd; and

- Data obtained during the 24-hour period on May 24, 2010, showing that the RITT collected 6,100 barrels of oil, which was less than all of the oil escaping from the well.

230.   It is clear that BP senior executives were aware of some, if not all, of this evidence.  Indeed, according to the civil complaint filed by the SEC and the criminal complaint

filed by the DOJ, Mike Mason, a vice president in BP's exploration and production technology division engineer who worked on the May 10-11, 2010 model discussed in the immediately preceding paragraph, emailed two BP executives, including defendant Inglis, to express concern over BP's continued reliance on the 5,000-bopd figure:

> I just read an article in CNN (May 14, 2010 1:00 p.m.) stating that a researcher at Purdue believes that the Macondo well is leaking up to 70,000 bopd and that BP stands by a 5,000 bopd figure. With the data and knowledge we currently have available we cannot definitively state the oil rate from this well. We should be very cautious standing behind a 5,000 bopd figure as our modeling shows that this well could be making anything up to ~100,000 bopd depending on a number of unknown variables, such as: flow path either through the annulus behind the production casing or through the production casing float shoe, the height of reservoir exposed, if drill pipe is suspended in the [blow out preventer] and sealed by [variable bore] rams, reservoir skin damage, choking effects and etcetera. We can make the case for 5,000 bopd only based on certain assumptions and in the absence of other information, such as a well test.

231.    According to a *Huffington Post* article titled "BP Oil Spill Emails Reveal High-Level Discord Over Flow Estimates," Jack Lynch, BP's general counsel in the United States, forwarded Mason's email to defendants Suttles and Rainey on May 16, 2010.

232.    The revelation of BP's internal flow rate estimates led Representative Markey to observe that "[n]ow we know what we always knew – this spill is much larger than BP claimed.… What's clear is that BP has had an interest in lowballing the size of their accident, since every barrel spilled increases how much they could be fined by the government."

233.    As explained in the SEC civil complaint, by April 28, 2010, BP possessed at least five pieces of evidence indicating potential flow rates substantially higher than the 5,000 barrels advertised by BP. Four of these clues were generated internally, including: a model of possible oil flow paths, created by a BP engineer on or about April 22, 2010, that indicated flow rates of between 64,000 and 146,000 barrels of oil per day; an estimate generated on or before April 24,

2010, showing that, in the immediate wake of the explosion aboard the *Deepwater Horizon*, oil was flowing through the still-attached riser at a rate of approximately 100,000 barrels of oil per day; an estimate, generated by a BP engineer on or about April 27, 2010, indicating that, given a number of factors, including the temperature along the riser pipe, oil was escaping at a rate of 5,000 to 22,000 barrels per day; and a series of calculations, prepared by defendant Rainey, evincing a flow rate of anywhere from 1,000 to over 14,000 barrels of oil per day.  In addition, BP engineers were made aware of an external calculation, made on or before April 25, 2010, concluding that the flow rate could be as high as 10,000 barrels of oil per day.

## VIII.  RELIANCE

234.    Plaintiffs and/or their investment managers or brokers acting on Plaintiffs' behalf, actually, reasonably and/or justifiably relied upon Defendants' misleading statements by, among other things: (i) reading BP's SEC filings; (ii) reading analyst reports regarding BP; (iii) reading newspaper accounts and hearing other media accounts regarding BP; and/or (iv) relying on the assumption that the price of BP shares reflected accurate and truthful information issued by or on behalf of the Company.

## IX.    THE CLAIMS ARE TIMELY FILED

235.    These claims are filed within the applicable statute of limitations and/or are otherwise tolled as a result of the filing of the Class Action Complaint filed in Texas federal court.  The Texas federal action tolled the statute of limitations for all of the claims of individual class members, including state law claims continuing at least until February 13, 2012, when the Court dismissed all claims based on purchases of BP ordinary shares on foreign exchanges.

## X.      COUNTS

### COUNT I

### AGAINST ALL DEFENDANTS FOR VIOLATIONS OF
### THE TEXAS SECURITIES ACT, TX CIV ST ART. 581-33(A)(2)

236.    Plaintiffs repeat and reallege each of the allegations above as if fully set forth herein.

237.    In violation of the Texas Securities Act, Art. 581-33, Defendants sold or offered to sell, either directly or indirectly, BP shares to Plaintiffs by means of untrue statements of material fact and by means of omissions to state material facts necessary in order to make the statements that were made, in light of the circumstances under which they were made, not misleading, Plaintiffs not knowing of such untruths or omissions.  During the Relevant Period, Defendants were sellers or controlled the sellers of BP shares.

238.    At all relevant times, Defendants, individually and in concert with others, directly and indirectly, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs; made various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; made the above statements with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and, did: (i) deceive the investing public, including Plaintiffs, regarding, among other things, BP's implementation of specific process safety protocols and BP's ability to respond to oil spills in the Gulf of Mexico; (ii) artificially inflate and maintain the market price of BP's shares; and (iii) cause Plaintiffs to purchase BP shares at artificially inflated prices.

94

239.    Proof of scienter is not required for establishment of liability under the Texas Securities Act, Art. 581-33.  To the extent it is required to allege scienter for any other claim, it is alleged that Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing BP's process safety protocols and BP's ability to respond to oil spills in the Gulf of Mexico from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' misstatements of BP's process safety protocols and BP's ability to respond to oil spills in the Gulf of Mexico, if they did not have actual knowledge of the misrepresentations and omissions alleged, they were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

240.    Proof of reliance is also not required for establishment of liability under the Texas Securities Act, Art. 581-33.  To the extent it is required to allege reliance for any other claim, as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of BP's shares was artificially inflated at the time Plaintiffs acquired BP shares.  In ignorance of the fact that the market price of BP's securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, and/or upon the integrity of the market in which the securities traded, and/or in the absence of material adverse information that was known to or recklessly disregarded by them, but not disclosed in public statements by them, Plaintiffs acquired BP's shares during the Relevant Period at artificially inflated prices and were damaged thereby.

95

241.     At the time of said misrepresentations and omissions, Plaintiffs were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the marketplace known the truth regarding the problems that BP was experiencing, which were not disclosed by Defendants, Plaintiffs would not have purchased or otherwise acquired their BP shares or would not have done so at the artificially inflated prices which they paid.

242.     By virtue of the foregoing, Defendants have violated the Texas Securities Act, Art. 581-33(A)(2).

243.     As a direct and proximate result of the wrongful conduct of Defendants, Plaintiffs suffered damages in connection with their purchases of BP shares.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF THE TEXAS SECURITIES ACT, TX CIV ST ART. 581-33(F)(1)

244.     Plaintiffs repeat and reallege each of the allegations above as if fully set forth herein.

245.     BP, BP America, and BP Exploration committed a primary violation of Art. 581-33 of the Texas Securities Act by making the false and misleading statements of material facts, identified above, in connection with the purchase or sale of securities.  At the time that these false and misleading statements were made, BP, BP America, and BP Exploration either knew of, or recklessly disregarded, their falsity.

246.     At all relevant times, each of the Individual Defendants had direct or indirect control and/or supervisory involvement in the operations of BP, BP America, and/or BP Exploration or materially aided in the sale of BP shares and therefore had the power to control or influence the particular transactions giving rise to the violations of Art. 581-33 of the Texas

96

Securities Act by BP, BP America, and BP Exploration as alleged herein, and exercised the same.

247.    By reason of their status as officers of BP, BP America, and/or BP Exploration, the Individual Defendants are "controlling persons" within the meaning of Art. 581-33(F)(1) of the Texas Securities Act because they had the power and influence to cause BP, BP America, and/or BP Exploration to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of BP, BP America, and/or BP Exploration's business, the information contained in its filings with the SEC, and public statements about its business.

248.    Each of the Individual Defendants was provided with or had access to copies of BP's, BP America's, and/or BP Exploration's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

249.    As set forth above, each of the Individual Defendants controlled BP, BP America, and/or BP Exploration, each of which violated Art. 581-33 of the Texas Securities Act by its acts and omissions as alleged in this complaint.  By virtue of their positions as controlling persons, they are liable pursuant to Art. 581-33(F)(1) of the Act.  As a direct and proximate cause of the wrongful conduct set forth in this Count, Plaintiffs suffered damages in connection with their purchases of the Company's shares during the Relevant Period.

250.    An intent to deceive and reliance of the Plaintiffs are not required or necessary elements under Art. 581-33 of the Texas Securities Act.  A cause of action under Art. 581-33 of the Texas Securities Act does not require pleading or proof of: (1) a defendant's scienter or (2)

the Plaintiffs' reliance.

## COUNT III

### AGAINST ALL DEFENDANTS FOR
### COMMON LAW FRAUD UNDER TEXAS LAW

251.    Plaintiffs repeat and reallege each of the allegations above as if fully set forth herein.

252.    Defendants, individually and in concert with others, directly and indirectly, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs; made various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; made the above statements with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and did: (i) deceive the investing public, including Plaintiffs, regarding, among other things, BP's implementation of specific process safety protocols and BP's ability to respond to oil spills in the Gulf of Mexico; (ii) artificially inflate and maintain the market price of BP's shares; and (iii) cause Plaintiffs to purchase BP shares at artificially inflated prices.

253.    When making the false and misleading representations, Defendants knew they were false or made them with reckless disregard for their truth.

254.    Because BP is a public company, Defendants knew and understood that BP's statements would be distributed to Plaintiffs and the investing public, and that investors, such as Plaintiffs, and or their agents, would rely and had a right to rely on such statements.  Defendants were required to present BP's operations in a fair and accurate manner in, among other

98

documents, reports that Defendants were required to file with regulators (such as the MMS), SEC filings, press releases and other public statements.  Moreover, because BP, BP America, and BP Exploration were involved in drilling for oil in the Gulf of Mexico, Defendants knew and understood that statements regarding BP, BP America, and BP Exploration's oil spill response capabilities would be distributed to Plaintiffs and the investing public, and that investors, such as Plaintiffs and/or their agents, would rely and had a right to rely on such statements.  Defendants were required to present BP, BP America, and BP Exploration's oil spill response capabilities in a fair and accurate manner in, among other documents, reports that Defendants were required to file with regulators (such as the MMS), SEC filings, press releases, and other public statements.

255.    All Defendants provided misleading information and suppressed, concealed, and omitted to disclose material facts that Defendants were under a duty to communicate truthfully and fully to Plaintiffs, which constitutes fraud.

256.    All Defendants were in positions of vastly superior knowledge concerning BP as compared to Plaintiffs and/or their agents, and Defendants all had access to BP and its officers and employees, thus possessing access to information which Plaintiffs did not have and in the ordinary course of their activities would not obtain.   All Defendants knew, or recklessly disregarded, or were reckless in not knowing, of the misrepresentations of material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.  Defendants acted with knowledge of, or recklessly disregarded the severe risk of, loss to Plaintiffs that would be proximately caused by Defendants' acts and omissions described herein.

257.    All Defendants were in possession of the material undisclosed facts and willfully or knowingly or recklessly concealed them.   Defendants, acting in concert and conspiracy,

engaged in the aforesaid omissive, and therefore deceptive and fraudulent acts, practices, and courses of business with the intent to take advantage of the position of inferior knowledge and ignorance of the true facts on the part of the Plaintiffs, and in order to take advantage of Plaintiffs' trust and confidence in Defendants, and with the intent to defraud Plaintiffs.

258.    Defendants made (as attributed to them above), or caused BP, BP America, and BP Exploration to make false and misleading representations with the intent that they be acted upon by others, including investors in BP shares.

259.    Plaintiffs and/or their agents, relying upon Defendants' statements containing the false and misleading information and/or the integrity of the market, purchased BP shares at artificially inflated prices during the Relevant Period.

260.    Plaintiffs and/or their agents acted in justifiable reliance on Defendants' false and misleading statements and/or the integrity of the market, without knowing that Defendants' statements were false, when making investment decisions regarding BP shares.  Defendants' false and misleading statements also induced Plaintiffs and/or their agents to retain Plaintiffs' holdings in BP shares during the Relevant Period.

261.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of BP securities.

## COUNT IV

### AGAINST ALL DEFENDANTS FOR
### STATUTORY FRAUD – TEX. BUS. & COMM. CODE § 27.01

262.    Plaintiffs repeat and reallege each of the allegations above as if fully set forth herein.

263.    At all relevant times, Defendants, individually and in concert with others, directly

and indirectly, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs; made various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; made the above statements with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and did: (i) deceive the investing public, including Plaintiffs, regarding, among other things, BP's implementation of specific process safety protocols and BP's ability to respond to oil spills in the Gulf of Mexico; (ii) artificially inflate and maintain the market price of BP's shares; and (iii) cause Plaintiffs to purchase BP shares at artificially inflated prices.

264.    Section 27.01 does not require proof of knowledge or recklessness to establish liability.  However, as set forth above, it is alleged that Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing BP's process safety protocols and BP's ability to respond to oil spills in the Gulf of Mexico from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' misstatements of BP's process safety protocols and BP's ability to respond to oil spills in the Gulf of Mexico, if they did not have actual knowledge of the misrepresentations and omissions alleged, they were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

265.    Because BP is a public company, Defendants knew and understood that BP's

statements would be distributed to Plaintiffs and the investing public, and that investors, such as Plaintiffs and/or their agents, would rely and had a right to rely on such statements.  Defendants were required to present BP's operations in a fair and accurate manner in, among other documents, reports that Defendants were required to file with regulators (such as the MMS), SEC filings, press releases, and other public statements.  Moreover, because BP, BP America, and BP Exploration were involved in drilling for oil in the Gulf of Mexico, Defendants knew and understood that statements regarding BP, BP America, and BP Exploration's oil spill response capabilities would be distributed to Plaintiffs and the investing public, and that investors, such as Plaintiffs and/or their agents, would rely and had a right to rely on such statements.  Defendants were required to present BP, BP America, and BP Exploration's oil spill response capabilities in a fair and accurate manner in, among other documents, reports that Defendants were required to file with regulators (such as the MMS), SEC filings, press releases, and other public statements.

266.    All Defendants provided misleading information and suppressed, concealed, and omitted to disclose material facts that Defendants were under a duty to communicate truthfully and fully to Plaintiffs, which constitutes fraud.

267.    All Defendants were in positions of vastly superior knowledge concerning BP as compared to Plaintiffs and/or their agents, and Defendants all had access to BP and its officers and employees, thus possessing access to information which Plaintiffs did not have and in the ordinary course of their activities would not obtain.  All Defendants knew, or recklessly disregarded, or were reckless in not knowing, of the misrepresentations of material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.  Defendants acted with knowledge of, or recklessly disregarded the severe risk of, loss to Plaintiffs that would be proximately caused by Defendants' acts and omissions

described herein.

268.    All Defendants were in possession of the material undisclosed facts and willfully or knowingly or recklessly concealed them.  Defendants, acting in concert and conspiracy, engaged in the aforesaid omissive, and therefore deceptive and fraudulent acts, practices and courses of business with the intent to take advantage of the position of inferior knowledge and ignorance of the true facts on the part of the Plaintiffs, and in order to take advantage of Plaintiffs' trust and confidence in Defendants, and with the intent to defraud Plaintiffs.

269.    Defendants made (as attributed to them above), or caused BP, BP America, and BP Exploration to make false and misleading representations with the intent that they be acted upon by others, including investors in BP shares.

270.    Plaintiffs and/or their agents, relying upon Defendants' statements containing the false and misleading information and/or the integrity of the market, purchased BP shares at artificially inflated prices during the Relevant Period.

271.    Plaintiffs and/or their agents acted in justifiable reliance on Defendants' false and misleading statements and/or the integrity of the market, without knowing that Defendants' statements were false, when making investment decisions regarding BP shares.  Defendants' false and misleading statements also induced Plaintiffs and/or their agents to retain Plaintiffs' holdings in BP shares during the Relevant Period.

272.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of BP securities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Awarding compensatory damages and equitable relief in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(b) Awarding exemplary damages in favor of Plaintiffs against all Defendants;

(c) Awarding Plaintiffs pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs; and

(d) Awarding such other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: December 21, 2012

KENDALL LAW GROUP LLP

By: /s/ *Joe Kendall*

Joe Kendall
Texas Bar No. 11260700
Jamie J. McKey
Texas Bar No. 24045262
3232 McKinney Avenue
Suite 700
Dallas, TX 75204
Tel.: 214.744.3000
Fax: 214.744.3015

*Local Counsel*

**SPECTOR ROSEMAN KODROFF & WILLIS, P.C.**
Mark S. Willis
1101 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C. 20004
Tel.: 202.756.3601
Fax: 202.756.3602

Robert M. Roseman
Andrew D. Abramowitz
Daniel J. Mirarchi
Joshua B. Kaplan
1818 Market Street
Suite 2500
Philadelphia, PA 19103
Tel.:  215.496.0300
Fax:  215.496.6611

*Counsel for Plaintiffs*